# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

COPAR PUMICE COMPANY, INC.,

       Plaintiff,

vs.                                                                    No. CIV 07-0079 JB/ACT

ALLAN MORRIS, in his individual capacity,
DAVID YANTOS, in his individual capacity,
MARY UHL, in her individual capacity,
DEBRA McELROY, in her individual capacity,
and RON CURRY, in his official capacity as
Secretary of the New Mexico Environment
Department,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendants' Motion for Summary

Judgment, filed June 24, 2007 (Doc. 28). The Court held a hearing on September 19, 2007. The

primary issues are: (i) whether the terms and conditions of the Air Quality Permit issued by the New

Mexico Environment Department ("NMED") constitute consent to conduct a warrantless search

pursuant to the terms of the state statute and permit; (ii) whether, if consent was given through the

permit, Morris and Yantos' search and seizure exceeded the consent given in the permit; and (iii)

whether the NMED inspectors received consent to conduct the relevant search and seizure from

Copar Pumice employee, Ismael Gomez. Because the permit constitutes consent to conduct a

warrantless search, but because there is a genuine issue of material fact whether the NMED

inspectors' search went beyond the consent that the permit provided, and because there is a genuine

issue of material fact whether Ismael Gomez consented to the search and seizure that took place, and

whether he possessed actual or apparent authority to give such consent, the Court will grant in part

and deny in part the Defendants' motion for summary judgment.

## FACTUAL BACKGROUND

Copar Pumice is engaged in the business of pumice mining.  See Amended Complaint for Violation of Civil Rights ¶ 4, at 2, filed July 3, 2007 (Doc. 36 )("Amended Complaint").  In 2006, and at all times material to this lawsuit, Copar Pumice was mining pumice and operating a screening plant at a mine located on United States Forest Service lands in the area of Jemez Springs, New Mexico.  See id.  Adrian Salazar is the plant manager of Copar Pumice's El Cajete mine.  See Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment, filed July 16, 2007 (Doc. 40)("Plaintiff's Response"), Affidavit of Adrian Salazar, Exhibit B ¶ 1, at 1 (executed July 13, 2007)("Salazar Aff.").

Copar Pumice's operation of the El Cajete pumice screening facility is subject to the terms of New Mexico's Air Quality Control Act, regulations adopted pursuant to the Act, and Air Quality Permit No. 899-M-2 issued by the NMED's Air Quality Bureau.  See Memorandum in Support of Defendants' Motion for Summary Judgment on the Basis of Qualified Immunity, filed June 25, 2007 (Doc. 33)("Defendants' Motion for Summary Judgment on the Basis of Qualified Immunity"), Exhibit C, Air Quality Permit, at 1.  The NMED Air Quality Permit was issued to Copar Pumice pursuant to the New Mexico Air Quality Control Act and the regulations adopted thereunder.  See Air Quality Permit at 1.  Specifically, the NMED Air Quality Permit issued to Copar Pumice states that it is issued "pursuant to the Air Quality Control Act (Act) and regulations adopted pursuant to the Act, including Title 20, New Mexico Administrative Code (NMAC), Chapter 2, Part 72, (20 NMAC 2.72), Construction Permits, Subpart II and is enforceable pursuant to the Act and the air quality control regulations applicable to this source." Air Quality Permit at 1.

Specific conditions were imposed in the permit.  Pursuant to the NMED Air Quality Permit, Copar Pumice's operation of the pumice screening facility was subject to specific enumerated conditions, including:

> 3.      Recordkeeping
>
> Daily records of the hours and days of operation, the daily production rates, and the frequency of the application of water or equivalent control measures shall be maintained.  This information shall be retained at the plant site for the most recent three (3) year period and shall be made available to Department personnel upon request.
>
> Condition 3 has been placed in the permit in accordance with 20 NMAC 2.72, Sections 210.B.4 and 210.F, to allow the Department to determine compliance with the terms and conditions of the permit.
>
> Compliance with Condition 3 will be based on Department inspection of records and logs.

Air Quality Permit at 4 (emphasis in original).  Permit Condition No. 9, entitled "Right to Access Property and Review Records," states:

> 9.      Right to Access Property and Review Records.
>
> The Department shall be given the right to enter the facility at all reasonable  times to verify the terms and conditions of this permit.  The company, upon request from an authorized representative of the Department, shall produce any records or information necessary to establish that the terms and conditions of this permit are being met.
>
> Condition 9 has been placed in the permit in accordance with 20 NMAC  2.72, Sections 210.B and 210.F, and 20 NMAC 2.73, to allow the Department to determine compliance with the terms and conditions of the permit.
>
> Compliance with Condition 9 will be based on Department inspections of the facility, production of records and information required to be maintained, and non-restricted entry to the property as defined in this condition.

Air Quality Permit at 8 (emphasis in original).  Conditions numbers 3 and 9 were "placed in the

permit . . . to allow the Department to determine compliance with the terms and conditions of th[e] permit." Air Quality Permit at 4, 8.

On August 28, 2006, as a result of a citizen complaint, NMED Environmental Compliance Specialists, Morris and Yantos, arrived at the Jemez Springs mine to conduct an inspection of Copar Pumice's pumice screening facility. See Memorandum in Support of Defendants' Motion for Summary Judgment, filed June 24, 2007 (Doc. 29)("Motion for Summary Judgment"), Exhibit B, Affidavit of Allan Morris ¶ 4, at 1 (executed May 23, 2007)("Morris Aff."). Morris and Yantos are Environmental Compliance Specialists employed by the State of New Mexico Air Quality Bureau. See Morris Aff. ¶ 1, at 1; Motion for Summary Judgment, Exhibit C, Affidavit of David Yantos ¶ 1, at 1 (executed on May 23, 2007)("Yantos Aff."). The two NMED employees conducted a compliance inspection of Copar Pumice's pumice screening facility. See Plaintiff Copar Pumice Company, Inc.'s Response to Defendants' Motion for Summary Judgment on the Basis of Qualified Immunity at 1-2, filed July 16, 2007 (Doc. 39).

At the time the NMED employees arrived at Copar Pumice's facility, Salazar, the plant manager, was away from the mine at a dental appointment. See Amended Complaint ¶ 10, at 3. The Defendants did not have a warrant. See Complaint ¶ 11, at 3. The inspection took place on a Monday from approximately 3:00 p.m. until 4:55 p.m. See Morris Aff. ¶¶ 5, 22 at 3, 6.

When Morris and Yantos arrived at the facility, there were only two employees working at the mine. See Plaintiff's Response ¶ 5, 6, at 4. One of the Copar Pumice employees at the site during the inspection was Ismael Gomez, who is employed as a laborer and front-end loader operator. See id., Exhibit A, Affidavit of Ismael Gomez ¶ 1, at 3 (executed July 12, 2007)("I. Gomez Aff."). Ismael Gomez had been employed by Copar Pumice for six months when the

-4-

inspection occurred.  See Salazar Affidavit ¶ 7, at 1 (executed July 13, 2007)("Salazar Aff.").

Ismael Gomez is a Mexican national who is authorized to work in the United States.  See I. Gomez Aff. ¶¶ 1, 2 at 1.  Copar Pumice contends that Ismael Gomez speaks Spanish.  See id. ¶ 4, at 1.  Copar Pumice also alleges that he does not speak English and does not understand English, although he knows a few words in English.  See id. ¶ 4, at 1.

The other Copar Pumice employee at the site during the inspection was Elias Gomez, who is also employed as a laborer and loader operator.  See Salazar Aff. ¶ 10, at 2.  Copar Pumice contends that neither Ismael Gomez nor Elias Gomez have supervisory authority at the mine, have any record-keeping functions, or have any legal authority to grant or deny access to inspectors.  See id.

Morris and Yantos approached Ismael Gomez.  See Motion for Summary Judgment on the Basis of Qualified Immunity ¶ 22 at 7.  The Defendants contend that Ismael Gomez was wearing a shirt with the names "Copar" and "Ismael" on it.  Motion for Summary Judgment ¶ 9, at 4. The Defendants contend that they identified themselves as employees of the NMED Air Quality Bureau and informed Ismael Gomez that they were there to conduct a compliance inspection.  See id. ¶ 9, at 4.  The Defendants also contend that they presented their identification cards to Ismael Gomez. See Morris Aff. ¶ 7, at 2.  The Defendants contend that Ismael Gomez informed Morris and Yantos that he was employed by Copar Pumice, that the plant manager was not present, and that the manager was not reachable by phone.  See Motion for Summary Judgment ¶ 10, at 4.

The Defendants assert that Morris and Yantos asked Ismael Gomez if it was permissible for them to conduct the inspection without a company escort, to which he agreed.  See id. ¶ 11, at 4; Morris Aff. ¶ 14, at 3.  The Defendants allege that Morris asked Ismael Gomez if he knew where

any of Copar Pumice's operational records were located and that Ismael Gomez stated that he thought that some of the records would be with the plant manager in his truck. <u>See</u> Motion for Summary Judgment ¶ 12, at 4; Morris Aff. ¶ 15, at 3. The Defendants state that Morris then asked Ismael Gomez if he knew where there might be records at the site and that Ismael Gomez responded by pointing to one of the two trailers at the site. <u>See</u> Motion for Summary Judgment ¶ 12, at 4; Morris Aff. ¶ 15, at 3. Morris contends that he asked Ismael Gomez if he could take them to look for records, that Ismael Gomez said "yes," and that Ismael Gomez led the Defendants into an unlocked trailer. Motion for Summary Judgment ¶ 12, at 4; Morris Aff. ¶ 15, 16 at 3.

The Defendants contend that, once inside the trailer, they asked Ismael Gomez if it was permissible to look at the papers on the table and shelves, and Ismael Gomez said that looking at the papers was permissible. <u>See</u> Motion for Summary Judgment ¶ 12, at 4; Morris Aff. ¶ 17, at 3; Yantos Aff. ¶ 7, at 2. Morris and Yantos contend that, in the trailer, they located what appeared to them to be production documents that were relevant to compliance. <u>See</u> Morris Aff. ¶ 18, at 3; Yantos Aff. ¶ 8, at 2. In his affidavit, Morris contends that it was his impression that Ismael Gomez was familiar with the inside of the trailer and that Ismael Gomez operated some of the equipment controls in the trailer. <u>See</u> Morris Aff. ¶ 19, at 4. Morris states that he explained to Ismael Gomez that he and Yantos were going to walk around the facility to complete their inspection, and that they spoke with Ismael Gomez for approximately 20 to 30 minutes. <u>See</u> <u>id.</u> ¶ 20, at 4. Morris states that he and Yantos asked Ismael Gomez for permission to copy twenty-four pages of documents, but were told that there was no copier on site. <u>See</u> <u>id.</u> ¶ 18, at 3. Morris states that Ismael Gomez then gave them permission to take the documents off site for purposes of photocopying. <u>See</u> <u>id.</u> Both Morris and Yantos noticed during their conversation with Ismael Gomez that English was not his

-6-

primary language, but observed that he responded to their questions in English in a manner that indicated he understood them.  See Morris Aff. ¶¶ 11, 12, 21 at 2, 4; Yantos Aff. ¶ 6, at 2.

Copar Pumice disputes many of the Defendants' contentions regarding the events of the inspection.  Copar Pumice contends that, because Morris and Yantos were wearing hardhats when they approached him, Ismael Gomez assumed  that they were inspectors.  See I. Gomez Aff. ¶ 6, at 2.  Ismael Gomez states that, because he does not speak English, and because Morris and Yantos did not speak Spanish, he did not learn where the inspectors were from or what they wanted.  See id. Ismael Gomez contends that Morris and Yantos did not show him any form of identification, and if they introduced themselves, he did not understand them.  See id.

Ismael Gomez explains that, after Morris and Yantos said some words to him that he did not understand, the inspectors walked into a trailer at the mine, and that  he followed behind them.  See I. Gomez Aff. ¶ 7, at 2.  Ismael Gomez states that he did not lead the inspectors into the trailer.  See id.  Ismael Gomez contends that, after the inspectors entered the trailer, they began looking through the papers in the trailer.  See I. Gomez Aff. ¶ 8, at 2.  Ismael Gomez also contends that he did not operate any of the equipment controls while the inspectors were in the trailer.  See id. ¶ 13, at 2.

Ismael Gomez contends that he did not give the inspectors permission to look through the trailer and, because he does not speak English, does not know if they sought permission.  See id. ¶ 9, at 2.  Ismael Gomez says that he left the trailer and returned to work once the inspectors began to look through the papers.  See id. ¶ 10, at 2.  Ismael Gomez states that, if Morris explained to him that he was going to walk around the facility to complete his inspection, he did not understand, because he does not speak English.  See id. ¶ 14, at 2.  Ismael Gomez contends that he did not tell Morris that there was no photocopier on site and did not have any conversations with the inspectors.

See id. ¶¶ 15, 16, at 3.

Copar Pumice maintains that the records that Morris and Yantos removed from the trailer were not maintained pursuant to the terms of Copar Pumice's Air Quality Permit.  See Salazar Aff. ¶ 11, at 2 ; Affidavit of Ralph Martinez ¶ 6, 8 at 2 (executed July 12, 2007)("Martinez Aff.").  Copar Pumice represents that the records seized by Morris and Yantos were maintained for payroll purposes, mine safety purposes, and health administration purposes.  See Salazar Aff. ¶ 11 at 2.

After the inspectors left, Ruben Velasco, the foreman of Copar Pumice's El Cajete mine, returned to the mine.   See Affidavit of Ruben Velasco ¶¶ 1, 8 at 1-2 (executed July 13, 2007)("Velasco Aff.").  Ismael Gomez informed Velasco that two inspectors had come to the mine while Salazar was gone.  See id. ¶ 9, at 2.  Ismael Gomez stated that he did not know where the two inspectors were from or what their business was.  See id.  Ismael Gomez informed Velasco that the inspectors entered and searched the trailer.  See id. ¶ 10, at 2.  Velasco later learned that the inspectors seized records belonging to Copar Pumice -- none of which were maintained pursuant to the terms of Copar Pumice's Air Quality Permit.  See id. ¶ 10, 11 at 2.

The following day, on August 29, 2006, Copar Pumice's Environmental Compliance Coordinator, Ralph Martinez, learned that the NMED had conducted an inspection of El Cajete mine.  See Martinez Aff. ¶¶ 1, 3 at 1.  Martinez contacted Morris by telephone to discuss Morris and Yantos' entry into the trailer and their seizure of Copar Pumice's documents.  See id. ¶¶ 4, 5 at 2.  Martinez asked Morris what legal authority he had to enter Copar Pumice's trailer and seize records.  See id.  ¶ 5, at 2.  Morris advised Martinez that he had acted pursuant to the Air Quality Bureau's policies, and because the permit required Copar Pumice to deliver records upon request, he had the right to seize the records.  See id. ¶ 5, at 2.  Martinez informed Morris that he had committed an

illegal search and seizure, and that the records he seized were not records which Copar Pumice maintains pursuant to the terms of its Air Quality Permit.  See id. ¶¶ 6, 8 at 2. Also in his conversation with Morris on August 29, 2007, Martinez informed Morris that Salazar was at the dentist at the time of the inspection, and that Salazar returned to his home in Ponderosa, New Mexico after the appointment.  See id. ¶ 7, at 2.  Martinez states that Morris could not have had the conversation with Ismael Gomez that Morris describes in his affidavit, because Ismael Gomez does not speak English.  See id. ¶ 9, at 2.

The NMED, Morris, and Yantos "initiated an administrative penalty proceeding against Copar relying upon the records which they . . . seized from Copar."  Amended Complaint ¶ 15, at 3. Copar Pumice alleges that the administrative penalty proceeding has resulted in "the arbitrary and malicious assessment of substantial penalties against Copar which directly resulted from Copar's exercise of its constitutionally protected rights to object to the unlawful entry on its premises and seizure of its records in the administrative penalty proceeding and to file this lawsuit." Id. ¶ 16. at 3-4.  As a result of the compliance inspection, Copar Pumice was given written notice that it was in violation of seven permit conditions.  See id. ¶ 19, at 4.

## PROCEDURAL BACKGROUND

On January 23, 2007, Copar Pumice initiated a § 1983 action against the two NMED employees and against the Secretary of the NMED, alleging that the Defendants violated the Fourth Amendment's prohibition against unreasonable searches and seizures when the two NMED inspectors impermissibly entered Copar Pumice's office and seized business records, and that the inspection and seizure, conducted pursuant to NMED policy, violated the Fourth and Fourteenth Amendments to the United States Constitution.  See Complaint for Violation of Civil Rights, filed

January 23, 2007 (Doc. 1).  On  July 3, 2007 Copar Pumice Amended its Complaint for Violation of Civil Rights, alleging unconstitutional search and seizure and violation of equal protection, and seeking declaratory and injunctive relief.  See Amended Complaint at 5-8.

The Defendants move, pursuant to rule 56 of the Federal Rules of Civil Procedure, for summary judgment on Copar Pumice's Fourth Amendment claims and for dismissal of any and all remaining state-law claims.  See Motion for Summary Judgment at 16.  The Defendants move for summary judgment on the grounds that the undisputed facts of this case make clear that, in obtaining a permit to operate its pumice-screening facility, Copar Pumice specifically consented to the inspection that took place on August 28, 2006.  See  Motion for Summary Judgment at 2.  In addition, the Defendants contend that Copar Pumice's employee voluntarily consented to the inspection and to the copying of documents, thus effectively waiving the requirement of a warrant. See id.  Copar Pumice filed a Memorandum in Opposition to Defendants' Motion for Summary Judgement.  See Plaintiff's Response.  In its response, Copar Pumice argues that the Court should deny the Defendants' motion for summary judgment, because there are genuine issues of material fact whether Copar Pumice's permit constitutes consent to the search and seizure that the Defendants conducted, and whether Copar Pumice's employee gave actual consent to the search and seizure. See Plaintiff's Response at 1-12.  Furthermore, Copar Pumice argues that the reasonableness of any conclusion of apparent authority is a question of fact.  See Plaintiff's Response at 12-14.

On August 10, 2007, the Defendants responded by filing a reply brief in support of their motion for summary judgment.  See Defendants' Reply Brief in Support of Motion for Summary Judgment, filed August 10, 2007 (Doc. 49)("Defendants' Reply").

## STANDARD FOR DECIDING MOTIONS FOR SUMMARY JUDGMENT

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)(citing Fed R. Civ. P. 56(c)). The opposing party "'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)(citing Fed. R. Civ. P. 56(e)). An issue of fact is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the non-moving party. 477 U.S. at 249-50 (citations omitted). Mere assertions or conjecture as to factual disputes are not enough to survive summary judgment. See Branson v. Price River Coal Co., 853 F.2d 768, 771-72 (10th Cir. 1988).

The party seeking summary judgment has an "'initial burden to show that there is an absence of evidence to support the nonmoving party's case.'" Munoz v. St. Mary-Corwin Hosp., 221 F.3d 1160, 1164 (10th Cir. 2000)(quoting Thomas v. IBM, 48 F.3d 478, 484 (10th Cir. 1995)). Upon meeting that burden, the non-moving party must "identify specific facts that show the existence of a genuine issue of material fact." Munoz v. St. Mary-Corwin Hosp., 221 F.3d at 1164 (citations and internal quotations omitted). "The party opposing the motion must present sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor." Id. (citations and quotations omitted).

"The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."

Anderson v. Liberty Lobby, Inc., 477 U.S. at 252. The non-moving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. at 324 (internal quotations omitted). "In a response to a motion for summary judgment, a party cannot rest on ignorance of the facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial." Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Biester v. Midwest Health Servs., Inc., 77 F.3d 1264, 1266 (10th Cir. 1996)(internal quotations and citations omitted).  When evaluating a motion for summary judgment, the court examines the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. See Sigmon v. CommunityCare HMO, Inc., 234 F.3d 1121, 1125 (10th Cir. 2000).  Moreover, the court may consider only admissible evidence when ruling on a motion for summary judgment. See World of Sleep, Inc. v. La-Z-Boy Chair, Co., 756 F.2d 1467, 1474 (10th Cir. 1985)(citing Fed. R. Civ. P. 56(e)).

## RELEVANT NEW MEXICO STATUTES AND CASELAW REGARDING ADMINISTRATIVE SEARCHES

N.M.S.A. 1978 § 74-2-13 provides the following guidance regarding inspections of premises on which any records -- required to be maintained by regulations of the environmental improvement board, the local board, or by any permit condition -- are located:

> The secretary or the director or an authorized representative of either, upon presentation of his credentials:
>
> A. shall have a right of entry to, upon or through any premises on which an emission source is located or on which any records required to be maintained by regulations

of the environmental improvement board, the local board or by any permit condition are located; and

B. may at reasonable times:

(1) have access to and copy any records required to be established and maintained by regulations of the environmental improvement board or the local board or any permit condition;

(2) inspect any monitoring equipment and method required by regulations of the environmental improvement board, the local board or by any permit condition; and

(3) sample any emissions that are required to be sampled pursuant to regulation of the environmental improvement board, the local board or any permit condition.

N.M.S.A. 1978 § 74-2-13.  "[A] nonconsensual warrantless administrative inspection of business premises can only be made in very limited circumstances."  New Mexico Envtl. Improvement Div. v. Climax Chem Co., 105 N.M. 439, 440, 733 P.2d 1322, 1323 (Ct. App. 1987)(holding that, upon denial of consent to enter and inspect business premises, it was proper for the Environmental Improvement Division to act within the bounds of the relevant statute at all times by obtaining an administrative search warrant and conducting a search that was permitted under the relevant statute). The Supreme Court of New Mexico has held that a non-consensual, warrantless administrative inspection of business premises can be made only when:

> [(i)] the enterprise sought to be inspected is engaged in a business pervasively regulated by state or federal government; [(ii)] the inspection will pose only a minimal threat to justifiable expectations of privacy; [(iii)] the warrantless inspection is a crucial part of a regulatory scheme designed to further an urgent government interest; and [(iv)] the inspection is carefully limited as to time, place and scope.

State ex rel. Envtl. Improvement Agency v. Albuquerque Pub. Co., 91 N.M. 125, 571 P.2d 117 (1977).  Moreover, in New Mexico Environmental Improvement Division v. Climax Chemical Co., the New Mexico Court of Appeals stated that, if consent to enter and inspect is denied, the state must secure an administrative search warrant before the inspection occurs. See 105 N.M. at 440.

-13-

## RELEVANT FOURTH AMENDMENT LAW

The Fourth Amendment states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Amend. IV.  The Fourth Amendment generally requires a warrant and probable cause before the government may search or inspect a private business.  See United States v. Hajduk, 396 F.Supp.2d 1216, 1225 (D. Colo. 2005)(citing U.S. Const. amend. IV; See v. City of Seattle, 387 U.S. 541, 543 (1967)).  A search subject to Fourth Amendment protection occurs "when the government violates a subjective expectation of privacy that society recognizes as reasonable." Kyllo v. United States, 533 U.S. 27, 33 (2001).  "Fourth Amendment requirements only apply to places and to objects where an individual's expectation of privacy is objectively reasonable." United States v. Hajduk, 396 F.Supp.2d at 1225 (citing Kyllo v. United States, 533 U.S. at 33).  Specifically, the Supreme Court of the United States has held "that a Fourth Amendment search does not occur -- even when the explicitly protected location of a house is concerned -- unless 'the individual manifested a subjective expectation of privacy in the object of the challenged search,' and 'society [is] willing to recognize that expectation as reasonable.'" Kyllo v. United States, 533 U.S. at 33 (quoting California v. Ciraolo, 476 U.S. 207, 211 (1986).  "[E]xcept in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." Camara v. Municipal Court, 387 U.S. 523, 528-529 (1967).  For the search here to be valid and legal, the search and seizure must fall within a recognized exception to the Fourth Amendment's warrant requirement.

1.      __Law Regarding Warrantless Searches of Pervasively Regulated Industries__.

The Fourth Amendment prohibition on unreasonable searches and seizures is applicable to commercial premises.  See New York v. Burger, 482 U.S. 691, 699 (1987)(citing See v. City of Seattle, 387 U.S. 541, 543 (1967)). An owner or operator of a business, therefore, has an expectation of privacy in commercial property, but that expectation "is different from, and indeed less than, a similar expectation in an individual's home."  New York v. Burger, 428 U.S. at 699 (citing Donovan v. Dewey, 452 U.S. 594, 598-99 (1981)).

"It is well-established that a warrantless search is presumptively unreasonable under the Fourth Amendment and therefore invalid unless it falls within a specific exception to the warrant requirement." Roska ex. el Roska v. Peterson, 328 F.3d 1230, 1240 (10th Cir. 2003). The warrant requirement of the Fourth Amendment applies to commercial premises.  See See v. City of Seattle, 387 U.S. at 543-44; V-1 Oil Co. v. Wyo. Dep't of Envtl. Quality, 902 F.2d 1482, 1485 (10th Cir. 1990).  Exceptions to this requirement have developed, however, for "pervasively regulated business[es]," United States v. Biswell, 406 U.S. 311, 316 (1972), and for "'closely regulated' industries . . . long subject to close supervision and inspection." Marshall v. Barlow's, Inc., 436 U.S. 307, 313 (1978) (quoting Colonnade Catering Corp. v. United States, 397 U.S. 72, 74 (1970)).

A pervasively regulated business is one which has "'such a history of government oversight that no reasonable expectation of privacy could exist.'" V-1 Oil Co. v. Wyo. Dep't of Envtl. Quality, 902 F.2d at 1486 (quoting Marshall v. Barlow's Inc., 436 U.S. at 313).  "[T]he doctrine is essentially defined by 'the pervasiveness and regularity of the . . . regulation' and the effect of such regulation upon an owner's expectation of privacy."  New York v. Burger, 482 U.S. at 701 (quoting Donovan v. Dewey, 452 U.S. at 606).  Pervasively regulated industries "represent the 'exception' rather than

-15-

the rule." <u>Marshall v. Horn Seed Co.</u>, 647 F.2d 96, 99 n.1 (10th Cir. 1981) (quoting <u>Marshall v.</u> <u>Barlow's Inc.</u>, 436 U.S. at 313).

To be reasonable, the warrantless inspection of such a business must meet the three-part test that the Supreme Court enumerated in <u>New York v. Burger</u>.  <u>See</u> 482 U.S. at 702-703. Certain warrantless searches may be reasonable in the context of a pervasively regulated industry, provided the following criteria are met: (i) there is a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made; (ii) the warrantless inspection is necessary to further the regulatory scheme; and (iii) the statute's inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant. <u>See</u> <u>id.</u>  The regulatory statute must perform the two basic functions of a warrant: "[I]t must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers." <u>V-1 Oil Co.</u> <u>v. Wyo. Dep't of Envtl. Quality</u>, 902 F.2d at 1485.

To perform the first function of a warrant, the statute must be "sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." <u>Id.</u> (internal quotations and citations omitted).  The statute must provide notice to the particular business owner that his or her property will be subject to warrantless inspections.  <u>See</u> <u>id.</u> at 1487. "The only warrantless administrative searches which have been upheld are those conducted pursuant to narrow statutes which regulate particular industries." <u>Id.</u> (citing <u>Rush v. Obledo</u>, 756 F.2d 713, 718-19 (9th Cir.1985)).  <u>See</u> <u>Marshall v. Barlow's, Inc.</u>, 436 U.S. at 321.   Administrative searches conducted pursuant to statutes of general applicability require search warrants. <u>See</u>, <u>e.g.</u>, <u>Marshall v. Barlow's,</u>

-16-

Inc., 436 U.S. at 313-14 (Occupational Safety and Health Act); See v. City of Seattle, 387 U.S. at

546 (Seattle Fire Code); Lone Steer, Inc. v. Donovan, 565 F.Supp. 229, 232 (D.N.D.1982)(Fair

Labor Standards Act), rev'd on other grounds, 464 U.S. 408 (1984); Western Alfalfa Corp. v. Air

Pollution Variance Bd., 510 P.2d 907, 909-10 (Colo. Ct. App. 1973)(Colorado Air Pollution Control

Act), rev'd on other grounds, 416 U.S. 861 (1974); New Mexico Envtl. Improvement Div. v. Climax

Chem. Co., 105 N.M. 439, 733 P.2d 1322, 1323 (Ct. App. 1987)(New Mexico Hazardous Waste

Act).

      Furthermore, in defining how a statute limits the discretion of inspectors, the statutorily

authorized search must be "carefully limited in time, place, and scope." United States v. Biswell,

406 U.S. at 315.  To determine whether a statute provides a constitutionally adequate substitute for

a warrant, a district court must look to the statute itself.  See  V-1 Oil Co. v. Wyo. Dep't of Envtl.

Quality, 902 F.2d at 1485-87.  The Supreme Court has indicated that a warrant stating with

particularity the place to be searched or the items to be seized not only prevents general searches,

but "assures the individual whose property is searched or seized of the lawful authority of the

executing officer, his need to search, and the limits of his power to search." Groh v. Ramirez, 540

U.S. 551 (2004)(quotations omitted).  "The reasonableness of a warrantless search . . . will depend

upon the specific enforcement needs and privacy guarantees of each statute." Marshall v. Barlow's

Inc. 436 U.S. at 321.  It is the statutory scheme which sets the limits of an inspection, so that an

adequate substitute to the warrant requirement gives the permittee notice.  See Donovan v. Dewey,

452 U.S. at 603 (stating that, for a regulatory scheme to be constitutional, it must provide a

"constitutionally adequate substitute for a warrant.").  Searches and seizures outside the scope of

the statutory scheme must meet the warrant requirement of the Fourth Amendment.

-17-

At the hearing, both parties agreed that the Tenth Circuit's analysis in <u>V-1 Oil Company v.</u> <u>Wyoming Department of Environmental Quality</u> provided the correct analysis for their situation. <u>See</u> Transcript of Hearing at 42:16-20 (taken Sept. 19, 2007)("Tr.")(Walz); Tr. at 45:5-6 (Hart).[1] In <u>V-1 Oil Company v. Wyoming Department of Environmental Quality</u>, the state defendants contended that section 9 of the Wyoming Environmental Quality Act authorized warrantless searches and inspections of suspected sources of pollution. <u>See</u> 902 F.2d at 1484. That section of the Wyoming Statutes empowers certain officers to

> enter and inspect any property, premise or place, except private residences, on or at which an air, water or land pollution source is located or is being constructed or installed . . . . Persons so designated may . . . inspect any monitoring equipment or method of operation required to be maintained pursuant to this act . . . for the purpose of investigating actual or potential sources of air, water or land pollution and for determining compliance or noncompliance with this act.

Wyo. Stat. § 35-11-109(a)(vi).

In <u>V-1 Oil Company v. Wyoming Department of Environmental Quality</u>, a supervisor for the Wyoming Department of Environmental Quality noticed that concrete over underground storage tanks was being removed from the V-1 Oil station, which had a history of ground pollution. <u>See</u> 902 F.2d at 1484. On two occasions, the inspector tried to find out what was being done, and twice he was refused information about the property and permission to enter. <u>See id.</u> Informed of the inspector's situation, a senior assistant attorney general tried to obtain a court order allowing the inspector to inspect the premises; however, no judge was available. <u>See id.</u> The attorney then advised the inspector that the Wyoming statute permitted a warrantless inspection of the premises. <u>See id.</u> That evening, the inspector, the city attorney, and a police officer entered the V-1 Oil

---

[1] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

premises.  See id.  The inspector took a soil sample and visually inspected the excavation area.  See id.

V-1 Oil contended that the Wyoming statute did not authorize the search that took place, either because it does not authorize warrantless searches, or because it authorizes warrantless searches only of mandatory equipment and methods of operation.  See 902 F.2d at 1484-85.  V-1 Oil filed a complaint under 42 U.S.C. § 1983, alleging deprivation of its rights secured by the Fourth Amendment.  See 902 F.2d at 1484.  The Tenth Circuit held that the warrantless search was improper, because the statute is not so "'comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes.'"  Id. at 1486-87  (quoting Donovan v. Dewey, 452 U.S. at 600).

The Tenth Circuit in V-1 Oil Company v. Wyoming Department of Environmental Quality stated that the first problem with the statute was that it "provides no notice whatsoever to the owner of any particular business that his or her property will be subject to warrantless inspections." Id. at 1487.  Furthermore, the Tenth Circuit stated that the Act provided no "assurance of regularity" of the inspections.  Id. (internal citations and quotations omitted).  The Tenth Circuit held that, because the Act left inspectors with the ability to inspect any business at any time, a warrant was required. See id.  The Tenth Circuit stated that "a warrant is required if searches are 'so random, infrequent, or unpredictable that the owner . . . has no real expectation that his property will from time to time be inspected by government officials.'"  Id. (quoting Donovan v. Dewey, 452 U.S. at 599).

Ultimately, the Tenth Circuit in V-1 Oil Company v. Wyoming Department of Environmental Quality held that, because the statute did not provide a constitutionally adequate substitute for a warrant, the inspector's warrantless search violated V-1 Oil's Fourth Amendment

rights.  See V-1 Oil Company v. Wyo. Dep't of Envtl. Quality, 902 F.2d at 1487.  The Tenth Circuit

also held that the law establishing the violation was clearly established at the time of the violation.

See id. at 1488.  Specifically, the Tenth Circuit stated:

> When the search here at issue took place, the Burger decision was almost a year old.
> The Dewey decision, upon which Burger relied heavily, was almost seven years old.
> The Barlow's decision was almost ten years old. At the same time there was no
> precedent for the proposition that a generally applicable statute which permitted
> irregular inspections could constitutionally authorize a warrantless search. We hold
> that V-1's right not to be inspected without a search warrant pursuant to a statute
> such as the Wyoming Environmental Quality Act was clearly established.

Id.

        "[A]dministrative searches are an exception to the Fourth Amendment's warrant

requirement, but they are not an exception to the Fourth Amendment's requirement for

reasonableness." Bruce v. Beary, 498 F.3d 1232 (11th Cir. 2007) (citing Donovan v. Dewey, 452

U.S. at 598-99).  Warrantless administrative inspections are invalid if the inspectors' search exceeds

the permissible discretion under the authorizing statute.  In the very case in which the Supreme

Court recognized the permissibility of warrantless administrative inspections, it invalidated the

actual inspection conducted in the case because the inspectors' search exceeded their discretion

under the authorizing statute.  See Bruce v. Beary, 498 F.3d at 1243  (citing Colonnade Catering

Corp. v. United States, 397 U.S. at 77 (disapproving the use of force to open locked door)).  "As

with any search, then, the scope and execution of an administrative inspection must be reasonable

in order to be constitutional." Bruce v. Beary, 498 F.3d at 1244. Although a statute authorizing

administrative searches may be constitutional, actual searches conducted under that authority may

not.  See id.  "The question [the Court] must resolve, then, is whether the conduct of the

administrative inspection . . . was reasonable." Id.

2.      **Law Regarding Specificity Required in Warrants**.

In several opinions, the Tenth Circuit has clearly established that items to be seized must be described within the search warrant for seizure of those items to be reasonable.  It logically follows, therefore, that the statute acting as the adequate substitute for a warrant would  have to follow similar principles.  "The Fourth Amendment requires search warrants to particularly describe[e] the place to be searched, and the persons or things to be seized." United States v. Angelos, 433 F.3d 738, 744 (10th Cir. 2006)(internal quotations and citations omitted).

Furthermore, the Tenth Circuit has held that "[t]he Fourth Amendment requires that a search warrant describe the things to be seized with sufficient particularity to prevent a general exploratory rummaging in a person's belongings."  United States v. Campos, 221 F.3d 1143, 1147 (10th Cir. 2000)(internal citations and quotations omitted).  "A warrant's description of things to be seized is sufficiently particular if it allows the searcher to reasonably ascertain and identify the things authorized to be seized."  United States v. Hargus, 128 F.3d 1358, 1362 (10th Cir. 1997)(internal quotations and citations omitted). "The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another.  As to what is to be taken, nothing is left to the discretion of the officer executing the warrant."  Davis v. Gracey, 111 F.3d 1472, 1478 (10th Cir. 1997)(internal quotations and citations omitted).  "The test applied to the description of the items to be seized is a practical one . . . and the language in warrants is to be read in a common sense fashion. . . . As an irreducible minimum, a proper warrant must allow the executing officers to distinguish between items that may and may not be seized." Id. (internal citations and quotations omitted).

-21-

3.     **Law Regarding Administrative Seizures.**

The Tenth Circuit has held that the party who performed the seizure "bears the . . . burden of demonstrating the reasonableness of a warrantless seizure." United States v. Seslar, 996 F.2d 1058, 1062 (10th Cir. 1993). While not specifically addressing the need for administrative statutes to authorize seizure, New York v. Burger dealt with a warrantless search and seizure under the closely regulated business exception. See 482 U.S. 691. In New York v. Burger, the Supreme Court held that the warrantless administrative inspection of the pervasively regulated business was reasonable because it satisfied the three prongs of the test the Supreme Court set forth. See id. at 702-703.

The trial court in New York v. Burger noted that, during the warrantless inspection, the inspectors seized several items while conducting their search. See People v. Burger,125 Misc.2d 709, 710, 479 N.Y.S.2d 936, 938 (N.Y.Sup. 1984) rev'd. 482 U.S. 691 (1987). The statute authorizing the warrantless search, however, did not specifically permit seizures but rather only inspection. See New York v. Burger, 482 U.S. at 694. The Supreme Court held that the inspection was constitutional and reasonable under the Fourth Amendment, but did not specifically address whether the seizure of the items, not expressly  permitted by the statute, was a violation of the Fourth Amendment.  See id. at 702-703.

In United States v. Colonnade Catering Corp., 397 U.S. 72 (1970), a federal agent who was a member of the Alcohol and Tobacco Tax Division of the Internal Revenue Services was a guest at party on Colonnade Catering's premises and noted a possible Federal excise-tax violation.  See id. at 73.  Federal agents later visited the premises and, without the manager's consent, inspected the cellar.  See id.  The agents asked for the locked liquor storeroom to be opened, and Colonnade

Catering's president refused to open the door.  See id.  The agents admitted to not having a warrant and proceeded to break the lock on the storeroom door, enter the room, and removed bottles of liquor that they suspected of being refilled contrary to the command of 26 U.S.C. § 5301(c).  See United States v. Colonnade Catering Corp., 397 U.S. at 73.  The relevant statutes provided that the Secretary of Treasury or his delegate has broad authority to enter and inspect the premises of retail dealers in liquors.  See United States v. Colonnade Catering Corp., 397 U.S. at 73-74.  The statute also provided that if the dealer refused to permit the inspection he or she would be fined.  See id. at 74.  The Supreme Court stated: "The question is whether the imposition of a fine for refusal to permit entry -- with the attendant consequences that violation of inspection laws may have in this closely regulated industry -- is under this statutory scheme the exclusive sanction, absent a warrant to break and enter." Id.  The Supreme Court stated that it had recognized the special treatment of inspection laws of this kind in Boyd v. United States, 116 U.S. 616, 624 (1886).  The Supreme Court stated: "'(In) the case of excisable or dutiable articles, the government has an interest in them for the payment of the duties thereon, and until such duties are paid has a right to keep them under observation, or to pursue or drag them from concealment.'" United States v. Colonnade Catering Corp., 397 U.S. at 76 (quoting Boyd v. United States, 116 U.S. at 624).  The Supreme Court further noted:

> The seizure of stolen goods is authorized by the common law; and the seizure of goods forfeited for a breach of the revenue laws, or concealed to avoid the duties payable on them, has been authorized by English statutes for at least two centuries past; and the like seizures have been authorized by our own revenue acts from the commencement of the government. The first statute passed by Congress to regulate the collection of duties, the act of July 31, 1789, 1 Stat. 29, 43, contains provisions to this effect. As this act was passed by the same Congress which proposed for adoption the original amendments to the Constitution, it is clear that the members of that body did not regard searches and seizures of this kind as unreasonable, and they are not embraced within the prohibition of the amendment. . . . (I)n the case of

> excisable or dutiable articles, the government has an interest in them for the payment
> of the duties thereon, and until such duties are paid has a right to keep them under
> observation, or to pursue and drag them from concealment.

United States v. Colonnade Catering Corp., 397 U.S. at 76 (quoting Boyd v. United States, 116 U.S.

at 623).  In United States v. Colonnade Catering Corp., the Supreme Court stated: "We agree that

Congress has broad power to design such powers of inspection under the liquor laws  as it deems

necessary to meet the evils at hand." United States v. Colonnade Catering Corp., 397 U.S. at 76.

Furthermore, the Supreme Court held: "Where Congress has authorized inspection but made no rules

governing the procedure that inspectors must follow, the Fourth Amendment and its various

restrictive rules apply." Id. at 77.  Ultimately, the Supreme Court held that, under the existing

statutes, Congress selected a standard "that does not include forcible entries," and thus the agents

could not break and enter the storeroom without a warrant.  397 U.S. at 77.

In United States v. Biswell, the Supreme Court again addressed the issue of a pervasively

regulated business in which a warrantless search and seizure occurred.  See 406 U.S. 311.  Again,

like in New York v. Burger, the relevant portion of the statute that the Supreme Court deemed to

permit warrantless searches of the business did not specifically authorize the seizure of items located

during inspection.  See United States v. Biswell, 406 U.S. at 312.  The Supreme Court, however,

held that the seizure of two sawed-off rifles that police officers found during their inspection of a

pawnshop in Hobbs, New Mexico was constitutional.  See id. at 317.  The pawnshop owner was

indicted and convicted for dealing in firearms without having paid the occupational tax.  See id. at

313. "We have little difficulty in concluding that where, as here, regulatory inspections further

urgent federal interest, and the possibilities of abuse and the threat to privacy are not of impressive

dimensions, the inspection may proceed without a warrant where specifically authorized by statute."

Id. at 317.  In its opinion, the Supreme Court referenced its earlier opinion in United States v. Colonnade Catering Corp. and stated that "it is clear under Colonnade that the Fourth Amendment would not bar a seizure of illicit liquor."  United States v. Biswell, 406 U.S. at 314.  The Supreme Court also referenced its prior opinion's mention of the historically broad authority of government to regulate the liquor industry and the approval of similar inspection laws.  See  United States v. Biswell, 406 U.S. at 314.  Additionally, the Supreme Court quoted its language from United States v. Colonnade Catering Corp. detailing the history of the law regarding seizures of stolen goods and seizure of goods concealed to avoid the duties payable on them.  See id.  The Supreme Court explained that the history of duties law indicated that the members of Congress "did not regard searches and seizures of this kind as unreasonable, and they are not embraced within the prohibition of the amendment."  United States v. Biswell, 406 U.S. at 314 (internal citations and quotations omitted).  The Supreme Court noted that the "reasonableness of a warrantless search . . . will depend upon the specific enforcement needs and privacy guarantees of each statute."  Marshall's v. Barlow's, Inc., 436 U.S. at 321.

In See v. City of Seattle, the Supreme Court determined that a business owner's refusal  to permit a fire department's warrantless investigation of a locked commercial warehouse was constitutional.  See 387 U.S. at 546.  In coming to its decision, the Supreme Court stated: "It is now settled that, when an administrative agency subpoenas corporate books or records, the Fourth Amendment requires that the subpoena be sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome."  Id. at 544. The Supreme Court further stated: "The agency has the right to conduct all reasonable inspections of such documents which are contemplated by statute, but it must delimit the confines of a search by

designating the needed documents in a formal subpoena." Id.  The Supreme Court  held that such minimal limitations on administrative action is constitutionally required for investigative entry upon commercial establishments.  See id. at 545.  The Supreme Court stated: "Given the analogous investigative functions performed by the administrative subpoena and the demand for entry, we find untenable the proposition that the subpoena, which has been termed a 'constructive' search, is subject to Fourth Amendment limitations which do not apply to actual searches and inspections of commercial premises." Id. at 545-46 (internal citations omitted). The Supreme Court further stated: "We therefore conclude that administrative entry, without consent, upon the portions of commercial premises which are not open to the public may only be compelled through prosecution or physical force within the framework of a warrant procedure." Id. at 546.  "Any constitutional challenge to such programs can only be resolved, as many have been in the past, on a case-by-case basis under the general Fourth Amendment standard of reasonableness." Id. Therefore, the Supreme Court held that See could not be prosecuted for exercising his constitutional right to insist that the fire inspector obtain a warrant authorizing entry upon his locked warehouse. See id.

The Tenth Circuit has not directly addressed the question whether the seizure of an item from a pervasively regulated business during a warrantless search must be expressly authorized in the statute that acts as the warrant requirement under New York v. Burger.  Several Tenth Circuit cases provide some insight, however, into the Tenth Circuit's position on what is necessary for an adequate warrant as well as what is necessary for a warrantless seizure under the pervasively regulated business warrant exception.

In Roska ex rel. Roska v. Peterson, the Tenth Circuit stated:

Within the last thirty years, courts have increasingly recognized certain narrow circumstances that justify searches and seizures without reference to the Fourth

> Amendment's warrant clause or probable cause requirement. These are situations in which the requirement of a warrant based upon probable cause is ill-suited to achieving certain "special needs" of government, such as enforcing school discipline, New Jersey v. T.L.O., 469 U.S. 325, 333-40 . . . (1985), allowing administrative searches of the business premises of "closely-regulated industries," New York v. Burger, 482 U.S. 691, 700 . . . (1987), and taking inventory of seized items for "caretaking" purposes, Cady v. Dombrowski, 413 U.S. 433, 447-48 . . . (1973).

328 F.3d at 1241.  In United States v. Herrera, 444 F.3d 1238 (10th Cir. 2006), a police officer seized a commercial vehicle that he mistakenly believed was pervasively regulated.  See id. at 1241. In clarifying the correct premise of an administrative search, the Tenth Circuit stated: "An administrative search is . . . premised on the individual subject to the warrantless seizure and search knowingly and voluntarily engaging in a pervasively regulated business, and on the existence of a statutory scheme that puts that individual on notice that he will be subject to warrantless administrative seizures and searches." Id. at 1246 (internal quotations and citations omitted).  The Tenth Circuit relied on its decision in United States v. Seslar, which held that "the closely regulated industry line of cases does not justify the warrantless search of unregulated persons." United States v. Herrera  444 F.3d at 1245 (quoting United States v. Seslar, 996 F.2d at 1063).

In United States v. Seslar, the Tenth Circuit held that, "because the justification for permitting warrantless [regulatory] searches is that persons doing business in closely regulated industries have a significantly reduced expectation of privacy," id. at 1061, such a stop was not justified by the regulatory scheme if the truck did not fall within the parameters of that regulation, see id. at 1062-63. See also State v. Campbell, 19 Kan.App.2d 778, 875 P.2d 1010, 1013-14 (Kan. Ct. App. 1994)(holding random stop of rental truck that was transporting private property, and thus was not subject to Kansas regulations governing motor carriers, violated the Fourth Amendment); Dominguez v. State, 290 Ark. 428, 720 S.W.2d 703, 707-708 (Ark.1986) (holding that a statute that

-27-

arguably authorized random stops of motor carriers could not be read to authorize random stops of any motor vehicle merely to determine whether the detainees belonged to the regulated class).  The Tenth Circuit ultimately held that Herrera's truck was not a commercial vehicle subject to the Kansas regulatory scheme, and thus the scheme could not justify the officer stopping Herrera.

In United States v. Johnson, 408 F.3d 1313 (10th Cir. 2005), Oklahoma City police officers and detectives from the automobile theft unit arrived at Autoplex Salvage to conduct an administrative search.  See id. at 1316.  The officers did not have a warrant, but instead relied upon two Oklahoma statutes permitting warrantless administrative searches of salvage yards.  See Okla. Stat. tit. 47, § 591.6; Okla. Stat. tit. 47, § 4-111.  At the time of their search, the officers knew that Johnson, an employee at Autoplex Salvage, had been arrested for attempting to steal a truck a few nights earlier.  See  United States v. Johnson, 408 F.3d at 1321.  47 Oklahoma Statute Annotated § 591.6 provides:

> Every automotive dismantler and parts recycler shall keep a register of all purchases and sales of motor vehicles for three (3) years from the date of purchase or sale, showing the make, model, year, style, vehicle identification number, and name and address of the purchaser or seller of the motor vehicle. Such registers shall be made available for inspection by properly identified employees or agents of the Oklahoma Used Motor Vehicle and Parts Commission or identified law enforcement officers of the state, county and municipality where the business of the automotive dismantler and parts recycler is located, during reasonable business hours on business days. The inspection authority shall include the right to inspect any motor vehicle or parts thereof owned by or stored at the automotive dismantler and parts recycler's place of business.

Okla. Stat. tit. 47, § 591.6. 47 Oklahoma Statute Annotated  § 4-111 authorizes:

> Any peace officer of the state may inspect any vehicle of a type required to be registered hereunder in any public garage or repair shop or in any place where such vehicles are held for sale or wrecking, for the purpose of locating stolen vehicles and investigating the title and registration thereof.

Okla. Stat. tit. 47, § 4-111.  During the administrative search, the officers seized a firearm that was

-28-

found locked inside of Johnson's toolbox. See United States v. Johnson, 408 F.3d at 1322. After the search was conducted, Johnson was arrested and subsequently indicted on two counts: being a felon in possession of a firearm, and being a felon in possession of ammunition while under conditions of release. See id. at 1319.

Johnson argued that the search conducted in his case exceeded what was permissible under the Oklahoma statutes. See id. at 1320. The Tenth Circuit stated that the Supreme Court in New York v. Burger noted that, "'[s]o long as a regulatory scheme is properly administrative, it is not rendered illegal by the fact that the inspecting officer has the power to arrest individuals for violations other than those created by the scheme itself.'" United States v. Johnson, 408 F.3d at 1321, (quoting New York v. Burger, 482 U.S. at 717). Thus, "'an administrative scheme may have the same ultimate purpose as penal laws, even if its regulatory goals are narrower.'" United States v. Johnson, 408 F.3d at 1321 (quoting New York v. Burger, 482 U.S. at 713).

The Tenth Circuit in United States v. Johnson held that the administrative-inspection scheme in §§ 591.6 and 4-111 was directed, in part, to the detection of stolen vehicles and vehicle parts. See United States v. Johnson, 408 F.3d at 1321. The Tenth Circuit noted, however, that New York v. Burger "'did not endorse a scheme that would allow a warrantless search based on recently discovered evidence that criminal activity had occurred.'" United States v. Johnson, 408 F.3d at 1321 (quoting S & S Pawn Shop Inc., 947 F.2d at 440). The Tenth Circuit found that newly discovered evidence was not the basis for the search in Johnson's case and that the officers did not have "direct criminal suspicion" about Johnson or Autoplex Salvage. See United States v. Johnson, 408 F.3d at 1321. Rather, at the time of the search, the officers knew Johnson had been arrested attempting to steal a truck a few nights earlier and they knew he worked at Autoplex Salvage. See

id. They had a vague suspicion that the kind of criminal activity the administrative scheme was directed towards -- detecting car theft -- had occurred, or might be evident at the salvage yard where Johnson worked. See id.  The Tenth Circuit held that there is nothing unconstitutional in embarking upon an administrative inspection with that degree of criminal suspicion. See United States v. Johnson, 408 F.3d at 1321 (citing United States v. Villamonte-Marquez, 462 U.S. 579, 584 n. 3 (1983)(upholding administrative search of ship following an informant's tip that a vessel was carrying marijuana and noting that there was "little logic in sanctioning . . . examinations of ordinary, unsuspect vessels but forbidding them in the case of suspected smugglers")(internal quotations omitted)); United States v. Thomas, 973 F.2d 1152, 1155-56 (5th Cir. 1992). The Tenth Circuit stated: "We accordingly hold that the inspection, at least at its inception, did not go beyond what is permitted by the relevant statutes." United States v. Johnson, 408 F.3d at 1321.

The Tenth Circuit in United States v. Johnson also addressed whether the officers' search of the locked toolbox exceeded what §§ 591.6 and 4-111 permitted. See United States v. Johnson, 408 F.3d at 1322.  The Tenth Circuit explained that the statutes permit officers to examine "vehicles," vehicle "parts," and vehicle "parts . . . stored" at the salvage yard. Id.  The Tenth Circuit stated that Vehicle Identification Number (VIN) plates are "parts" of vehicles and that  nothing in the statutes obviously limits the officers to searching only for "major" or "large" parts of vehicles. Id.

While the officers in United States v. Johnson conducted a broad and detailed search of the entire premises,  the only item seized was the firearm found inside Johnson's toolbox. See id. The Tenth Circuit accordingly addressed whether the officers properly searched inside that toolbox.  See id.  At the time officers reached Johnson's locked toolbox, the officers knew that Johnson had been arrested attempting to steal a truck a few days before. See id. When officers commenced their

administrative inspection of the salvage yard, another stolen vehicle was being driven off the premises by the owner's nephew. See id. There was one, and possibly two, suspicious motorcycle frames very near Johnson's toolbox. See id. The toolbox was large enough to contain license plates and VIN plates. See id. Thus, the officers had at least a reasonable suspicion that the toolbox might contain something relevant to their administrative search and accordingly did not exceed what is permissible under the administrative-inspection statutes when they searched Johnson's toolbox. See id. Furthermore, the Tenth Circuit stated that the fact that the toolbox was locked did not place it off limits from inspection. See id.; United States v. Biswell, 406 U.S. at 317 (holding that officers executing warrantless search under the authority of an administrative inspection statute were entitled to demand that gun dealer unlock storeroom). The Tenth Circuit did not directly address the constitutionality of the actual seizure of the firearm.

Furthermore, in V-1 Oil Co. v. State of Wyoming Department of Environmental Quality, the Tenth Circuit stated that, in regards to a statute being an adequate warrant substitute, "[t]o satisfy the certainty and regularity requirement, an inspection program must define clearly what is to be searched, who can be searched and the frequency of such searches." 902 F.2d at 1487 (internal quotations and citations omitted).

Other Circuits have dealt with this issue more directly. The United States Court of Appeals for the Ninth Circuit, in United States v. Argent Chemical Laboratories, Inc., 93 F.3d 572 (9th Cir. 1996), stated that a defendant's argument that the closely regulated business exception did not extend to seizures was untenable in the context of the particular statute at issue. See 93 F.3d at 577. The statute at issue in United States v. Argent Chemical Laboratories, Inc. regulated drug manufacturers, and expressly and specifically rendered articles "liable to seizure." 93 F.3d at 574,

-31-

577.  The Ninth Circuit stated this wording alleviated the need for probable cause or a warrant to seize, because Congress expressly authorized seizures through the regulation.  See 93 F.3d at 574, 577.

The Ninth Circuit in United States v. Argent Chemical Laboratories, Inc. acknowledged that, while New York v. Burger discussed its criteria for closely regulated industries in terms of inspections only, warrantless seizures are appropriate when permitted by Congress. See id. at 574, n.1 (citing United States v. Biswell, 406 U.S. at 317 (finding that warrantless search and seizure of firearms on which the dealer had not paid the required special occupational tax was constitutional); Colonnade Catering Corp. v. United States, 397 U.S. at 77 (stating that warrantless seizure of illicit liquor was constitutional)).  The Ninth Circuit noted that the Supreme Court in United States v. Biswell held that, because the unwarranted inspection was constitutionally permissible, the seizure of the defendant's sawed-off rifles was not unreasonable under the Fourth Amendment.  See id.  The Ninth Circuit ultimately concluded that the closely regulated business exception "extends to seizure without warrant of what may be inspected without warrant, when Congress so authorizes." Id. at 577 (internal quotations and citations omitted)(emphasis added).

In applying the precedent that the Ninth Circuit set out, a district court in California held that, "[f]or the pervasively regulated business exception to the warrant requirement to apply not only to searches but also to seizures, the statutory regulation must expressly authorize seizures." Golden Day Schools, Inc. v. Pirillo, 118 F.Supp. 2d 1037, 1045 (C.D. Cal. 2000)(citing  United States v. Argent Chem. Labs., 93 F.3d at 574, 577)). The district court elaborated by stating: "[G]iven the policies underlying the pervasively regulated business exception to the warrant requirement, it is reasonable to infer that the Legislature did not, through its silence, intend to expand the powers of

state agents to seize . . . records without a warrant." <u>Golden Day Schools, Inc. v. Pirillo</u>, 118 F.Supp. 2d at 1045.  In following the rules set out by the Ninth Circuit, the district court held that, because the regulations offered no notice of a seizure of records, the defendants could not justify a warrantless seizure of the school's files.  <u>See id.</u> at 1045-46.

The United States Court of Appeals for the Sixth Circuit, in discussing the unconstitutionality of a warrantless seizure under the relevant statute, held: "[N]othing in the Act authorizes the wholesale seizure of records which took place here.  Even where a statute requires records to be maintained and authorizes on-premise inspection of them in the normal course, no precedent sanctions direct access to the record without demand in the absence of a search warrant." <u>United States v. Consolidated Coal Co.</u>, 560 F.2d 214, 217 (6th Cir. 1977).  The Sixth Circuit further stated: "It is, however, implicit . . . that the right to inspect does not carry with it the right, without warrant in the absence of arrest, to reach that which is to be inspected by a resort to self-help in the face of the owner's protest."  <u>Id.</u> (internal quotations and citations omitted).  In upholding the constitutionality of the warrant used to conduct a search of a coal mine, the Sixth Circuit held: "[W]arrants actually issued should be carefully tailored, by limiting the items to be seized, to prevent the abuses inherent in 'general, exploratory rummaging in a (company's) belongings.'" <u>Id.</u> (quoting <u>Coolidge v. New Hampshire</u>, 403 U.S. 443, 467,(1971)).

**4.      Consent Exception to the Warrant Requirement.**

A search conducted pursuant to valid consent does not violate the Fourth Amendment.  <u>See Schneckloth v. Bustamonte</u>, 412 U.S. 218, 219 (1973).  A knowing and voluntary consent to a search or inspection obviates the need for a search warrant under the Fourth Amendment.  <u>See Schneckloth v. Bustamonte</u>, 412 U.S. at 222. "A  third party's consent to search is valid if that person has either

the 'actual authority' or the 'apparent authority' to consent to a search of that property." <u>United States v. Kimoana</u> 383 F.3d 1215, 1221 (10th Cir. 2004)(quoting <u>United States v. Gutierrez-Hermosillo</u>, 142 F.3d 1225, 1230 (10th Cir.1998)).  Determination of  whether consent was voluntarily given is a question of fact based upon the totality of the circumstances.  <u>See Schneckloth v. Bustamonte</u>, 412 U.S. at 227.  The Tenth Circuit has determined that, for consent to be voluntary, two conditions must be met: "[(i)] There must be a clear and positive testimony that consent was unequivocal and specific and freely given; and [(ii)] The government must prove consent was given without duress or coercion, express or implied."  <u>United States v. Guerrero</u>, 472 F.3d 784, 789 (10th Cir. 2007)(citing <u>United States v. Butler</u>, 966 F.2d 559, 562 (10th Cir. 1992)).

"Actual authority" is where "a third party has authority to consent to a search of property if that third party has either [(i)] mutual use of the property by virtue of joint access, or [(ii)] control for most purposes over it." <u>United States v. Kimoana</u> 383 F.3d at 1221 (citing <u>United States v. Rith</u>, 164 F.3d 1323, 1329 (10th Cir. 1999)).  "Apparent authority" is present when, even if the person giving consent does not possess actual authority, the inspector reasonably believes that the person who consents to entry has the authority to grant it.  <u>United States v. Gutierrez-Hermosillo</u>, 142 F.3d 1225, 1230 (10th Cir. 1998).

The question of voluntary consent is one of fact to be determined from the totality of the circumstances.  <u>See Schneckloth v. Bustamonte</u>, 412 U.S. at 227.  Some of the factors that courts consider in assessing voluntary consent include the age of the consenting individual, his education, his intelligence, the lack of advice to the consenting individual of his or her constitutional rights, the nature and duration of the questioning, and knowledge of the right to refuse.  <u>See id.</u> at 226, 225-26.

In <u>United States v. Rucinski</u>, 658 F.2d 741 (10th Cir. 1981), a lumber company located on

private land had contracted with the federal government to purchase lumber. See id. at 743-44. As part of the contract, the lumber company agreed to permit Forest Service personnel "to arrive unannounced at random intervals and inspect the logging business," the purpose of which was to detect "irregularities or fraud in the defendant's logging operation." Id. at 743. Despite that the business was posted with no trespassing signs and was surrounded by a barbed wire fence, the Tenth Circuit concluded that "[a]n unannounced inspection was consented to by the defendant so he cannot effectively complain that the inspection was one he did not contemplate." Id. at 745. The Tenth Circuit noted that "Jackson Lumber Company was under a contractual obligation, as a provision of its timber purchase contract with the United States, to permit Forest Service 'scaling' personnel to arrive, unannounced and at random intervals, and to make inspections for the purpose of detecting irregularity or fraud in the operations of timber contractors." Id. at 745. The Tenth Circuit held that the unannounced inspection by the agents was something that the lumber company could have anticipated at any time and that the inspection was reasonably made under the conditions of the contract. See id. Furthermore, the Tenth Circuit noted that the inspection was made pursuant to the contract. See id.

In United States v. Brown, 763 F.2d 984 (8th Cir. 1984), a pharmacy owner entered into a contract with a state agency to provide prescription drugs to Medicaid recipients. See id. at 985. The terms of the contract required the maintenance of business records pertaining to the Medicaid prescriptions and required that the records be made available to agency officials for periodic audits. See id. at 986. In concluding that the owner had "explicitly consented to reasonable warrantless inspections of the pharmacy records by entering into the contract" with the state, the United States Court of Appeals for the Eighth Circuit noted:

> The government has a substantial interest in establishing methods by which it can effectively monitor compliance with the regulations governing the Medicaid Program and root out opportunities for and instances of fraud. We see no constitutional infirmity in the government requiring a provider to agree to maintain records of Medicaid transactions and to permit periodic audits of those records as a condition for participation in the Medicaid Program. In this case, the [owner was] aware of this condition and voluntarily entered into a contract with [the state] in which they authorized such audits in exchange for obtaining the benefits attendant to participation in the Medicaid Program.

Id. at 987-988.  The Eighth Circuit further noted that the record indicated that the search was conducted in a reasonable manner.  See id. at 988.

## ANALYSIS

The undisputed facts show that Copar Pumice consented to a warrantless inspection, which complied with the relevant state statute and permit issued pursuant to the statute, of its premises. There is a genuine issue of material fact, however, whether Morris and Yantos exceeded the scope of the permit's consent in their search and seizure.  Furthermore, there is also a genuine issue of material fact whether Copar Pumice's employee, Ismael Gomez, consented to Morris and Yantos' search and seizure.  Thus, the Court will grant the motion for summary judgment in part and deny it in part.  There is no genuine issue of material fact that Copar Pumice consented to a warrantless search as authorized by the permit and statute, thus the Court will grant the motion for summary judgment on that issue.  There is a genuine issue of material fact, however, whether Morris and Yantos' search and seizure exceeded the consent of the permit as well as whether Ismael Gomez gave consent for the search and seizure.  Thus, the Court will deny the motion for summary judgment on the remaining issues raised in the motion for summary judgment.

I.   **COPAR PUMICE CONSENTED TO A WARRANTLESS INSPECTION OF ITS PREMISES CONSISTENT WITH THE REQUIREMENTS IN THE AIR QUALITY PERMIT AND RELEVANT STATE STATUTE.**

The Defendants' first argument in support of their motion for summary judgment is that no warrant was required, because whether Copar Pumice's employees at the mine site did or did not consent to the search and seizure is immaterial: the terms of Copar Pumice's permit constitutes consent. See Motion for Summary Judgment at 9-10. Additionally, the Defendants argue that Copar Pumice's employee, Ismael Gomez, voluntarily consented to the search and seizure that took place. See id. at 10, 13-15. The Defendants contend that Ismael Gomez had both actual and apparent authority at the time he gave such consent. See id. at 10-12.

Copar Pumice contends that its permit did not constitute consent to the Defendants' search and seizure that took place. See Plaintiff's Response at 7-10. Copar Pumice does not argue, however, that all warrantless searches of its premises would violate its Fourth Amendment rights. See Plaintiff's Response at 7-10. Copar Pumice also does not dispute the constitutionality of the New Mexico Air Quality Control Act governing the warrantless inspection of its mining site. See Plaintiff Copar Pumice Company, Inc.'s Response to Defendants' Motion for Summary Judgment on the Basis of Qualified Immunity at 4, filed July 16, 2007 (Doc. 39)(stating that, "Copar does not dispute that the Air Quality Control Act's statutory scheme authorizing warrantless inspections is constitutional and meets the standards set forth in New York v. Burger, 482 U.S. 691 (1987)."). Thus, there is no issue that the Air Quality Control Act provides a constitutionally adequate substitute for a warrant. Copar Pumice also does not dispute that the operation of its pumice screening facility is subject to the terms and conditions of the permit that the NMED's Air Quality Bureau issued. See Plaintiff's Response at 7-12. Rather, Copar Pumice argues that there are genuine

issues of material fact whether the Defendants complied with the statute and the permit, which acted as the warrant substitute, and allowed the Defendants to conduct a warrantless search.  See Plaintiff's Response at 7-12.

The NMED Air Quality Permit requires, among other things, that Copar Pumice: (i) maintain records regarding its operation and its compliance with the terms of the permit; (ii) retain such records "at the plant site"; (iii) upon request by the NMED, make such records available to establish that the terms and conditions of the permit are being met; and (iv) give the NMED the right to enter the facility at all reasonable times to verify the terms and conditions of the permit.  Air Quality Permit.  The relevant state statute requires:

> The secretary or the director or an authorized representative of either, upon presentation of his credentials:
>
> > A. shall have a right of entry to, upon or through any premises on which an emission source is located or on which any records required to be maintained by regulations of the environmental improvement board, the local board or by any permit condition are located; and
> >
> > B. may at reasonable times:
> >
> > (1) have access to and copy any records required to be established and maintained by regulations of the environmental improvement board or the local board or any permit condition;
> >
> > (2) inspect any monitoring equipment and method required by regulations of the environmental improvement board, the local board or by any permit condition; and
> >
> > (3) sample any emissions that are required to be sampled pursuant to regulation of the environmental improvement board, the local board or any permit condition.

N.M.S.A. 1978 § 74-2-13.  In knowingly and voluntarily agreeing to the terms and conditions of the NMED Air Quality Permit, specifically granting the NMED a right of entry to the facility at all

reasonable times to verify the terms and conditions of the permit, Copar Pumice waived its rights under the Fourth Amendment to warrantless searches that comply with the requirements of the permit and the statute.  Copar Pumice had no objectively reasonable expectation of privacy in their facility to searches conducted pursuant to those authorities.  See Schneckloth v. Bustamonte, 412 U.S. at 222; Zap v. United States, 328 U.S. 624, 628 (1946)(finding that right to privacy was waived where contract with government allowed inspection of accounts and records), rev'd on other grounds, 330 U.S. 800 (1947); United States v. Rucinski, 658 F.2d at 743 (stating that lumber company under contract with government consented to a reasonable unannounced inspection), cert. denied, 455 U.S. 939 (1982); United States v. Brown, 763 F.2d at 988 (finding that pharmacy owner agreed to maintain records and make them available to government); United States v. Jennings, 724 F.2d 436, 448 (5th Cir. 1984)(finding that, where organization did not raise noncompliance with the agreement by the government, and the organization's agreement with the government stated: "Upon request, make all accounts and records pertaining to the Program available, to State Agency and United States Department of Agriculture representatives, for audit or review at any reasonable time and place," that by entering into this agreement, the organization voluntarily waived any claims to privacy that it might have had with respect to documents relating to this contract ).

Copar Pumice agreed that the NMED "shall be given the right to enter the facility at all reasonable times to verify the terms and conditions" of its permit.  Air Quality Permit at 8.  The terms and conditions of the permit included that Copar Pumice maintain specific records "at the plant site." Id. at 4. By agreeing to the permit conditions regarding recordkeeping and inspection, Copar Pumice consented to inspections conducted in compliance with the permit and the terms of the state statute.  See United States v. Brown, 763 F.2d at 988 (finding consent to warrantless

inspection and audit of records in contract with the government); United States v. Jennings, 724 F.2d at 448 (stating that a written contract waived claims to privacy with respect to documents required to be maintained pursuant to contract with the government that were obtained during a search made pursuant to and in compliance with the contract).

The Eighth Circuit's decision in United States v. Brown is instructive. By accepting the benefits of the Air Quality permit, Copar Pumice knowingly and voluntarily consented to NMED's right of entry to the facility "at all reasonable times to verify the terms and conditions" of the permit, and upon request, to production of "any records or information necessary to establish" compliance with the terms and conditions of the permit. Air Quality Permit at 8. Similar to the government's interest in United States v. Brown, New Mexico has a substantial interest in protecting the environment and the public from air pollution, and in establishing effective methods to monitor compliance with state air quality standards. Copar Pumice freely accepted the terms and conditions of its permit, and was aware of the inspection, recordkeeping, and monitoring provisions. Copar Pumice effectively, knowingly, and voluntarily waived its Fourth Amendment rights to searches conducted in compliance with the permit and the statute.

The undisputed facts show that, by accepting the terms of its Air Quality permit, Copar Pumice consented to any site inspection that was in compliance with the Air Quality Permit and the relevant state statute. Copar Pumice's Fourth Amendment rights would not be violated by such an inspection. Thus, the Defendants are entitled to summary judgment in part -- the Court finds that there are no genuine issue of material facts whether Copar Pumice consented to warrantless searches which were conducted in compliance with the statute and the permit. There are genuine issues of material fact, however, whether the inspection and seizure conducted by Morris and Yantos, on

August 28, 2006, complied with permit and relevant state statute.

**II.    THERE ARE GENUINE ISSUES OF MATERIAL FACT WHETHER DEFENDANTS' INSPECTION OF COPAR PUMICE'S PUMICE SCREENING FACILITY COMPLIED WITH THE AIR QUALITY PERMIT AND RELEVANT STATE STATUTE, AND THUS WHETHER IT EXCEEDED THE CONSENT GIVEN IN THE PERMIT.**

Copar Pumice contends that genuine issues of material fact exist whether, in the absence of a warrant, Morris and Yantos had permission to conduct the search executed on August 28, 2006. See Plaintiff's Response at 7-12.  Copar Pumice contends that the New Mexico Air Quality Control Act "authorizes entry onto premises on which an emissions source is located upon the inspector's presentation of credentials."  Plaintiff's Response at 8.  Ismael Gomez' affidavit states:

> The men were wearing hard hats so I assumed they were inspectors.  Since I do not speak English and they did not speak Spanish, I did not learn where the inspectors were from or what they wanted.  They did not show me any form of identification. If they introduced themselves, I did not understand them.

I. Gomez Aff. ¶ 6, at 2.  Furthermore, Copar Pumice argues that the Air Quality Permit requires that inspectors make an actual request for records from a permittee, and does not authorize the department to help themselves to a search and then seize the records.  See Plaintiff's Response at 9.  Specifically, the permit states: "The company, upon request from an authorized representative of the Department, shall produce any records or information necessary to establish that the terms and conditions of this permit are being met." Air Quality Permit at 8 (emphasis added).  Ismael Gomez' affidavit raises a genuine issue of material fact whether a request, pursuant to the permit, was made. Ismael Gomez states:

> After saying some words to me which I did not understand, the inspectors walked into the trailer at the mine.  I followed behind them into the trailer because I knew no one was in the trailer to meet with them.  I did not lead the inspectors into the trailer at the mine.  After the inspectors entered the trailer they began looking through the papers and things that were on the shelves and on a table in the trailer.

> I did not give the inspectors permission to look through the papers in the office. . . . If Mr. Morris explained to me that he was going to walk around the facility to complete his inspection, I did not understand that statement because I do not speak English. . . . I did not have any conversations with the inspectors.

I. Gomez Aff. ¶¶ 7, 8, 9, 14, 16 at 2-3.  Additionally, Copar Pumice states that the seizure of documents is not authorized by the Air Quality Control Act's statutory scheme, and that the documents which Morris and Yantos seized  were not maintained for Air Quality Control purposes. See Plaintiff's Response at 10.

In viewing the facts in the light most favorable to Copar Pumice, the non-moving party, there is a genuine issue of material fact whether Morris and Yantos complied with the permit and state statute under which Copar Pumice had consented to permit warrantless searches.  There is a genuine issue of material fact whether Morris and Yantos properly and reasonably presented their credentials and requested the records.  Furthermore, the Court has already found in its Memorandum Opinion and Order, filed March 21, 2008 (Doc. 60), that Morris and Yantos' seizure of the documents exceeded the boundaries of the substitute for a warrant and thus was a violation of Copar Pumice's Fourth Amendment rights.  See id. at 41-44.[2]  Thus, the Court finds that there is a genuine issue of material fact whether Morris and Yantos complied with the requirements of the state statute and the permit and thus whether their inspection exceeded the consent that Copar Pumice gave by agreeing to the permit.

The Defendants argue that the cases cited by Copar Pumice in its Response do not pertain to, refute, or undermine the argument that the Defendants put forth, namely, that Copar Pumice had no expectation of privacy in the inspected premises or the seized records maintained pursuant to the

---

[2] The Court herein adopts, by reference, the relevant arguments and law set forth in its prior Memorandum Opinion and Order filed March 21, 2008 (Doc. 60).

Air Quality Permit, because Copar Pumice had voluntarily and freely waived its privacy rights when it agreed to the NMED Air Quality Permit's terms. See Defendants' Reply at 5. The Defendants contend that cases regarding warrantless administrative inspections pursuant to a statute involve a distinct body of law from written consent cases. See id. (citing United States v. Griffin, 555 F.2d at 1325 n.2). While the Court acknowledges that there is a permit in this case that grants consent to certain warrantless searches, the existence of a permit does not give consent to searches that go beyond the scope of a permit. Furthermore, the Court finds the case law involving statutes permitting warrantless searches relevant to this case, because it is the statutory scheme as well as the permit that creates the warrant substitute in this case.

Although a permit is involved in this case, the general Fourth-Amendment principles still apply, because Copar Pumice's records are not public property, but rather are private property subject to certain warrantless inspections by regulatory authorities. Thus, the Defendants must show that Copar Pumice consented to any part of the search and seizure conducted that exceeded the consent given in the permit. If the Defendants' search exceeded the scope of the consent given, that portion of the search must be subject to a warrant or come within another exception to the warrant requirement. Thus, because there is a genuine issue of material fact whether Morris and Yantos exceeded the scope of permission granted in the permit, the Court will deny summary judgment on the grounds that the permit gave consent to conduct the inspection that took place on August 28, 2006.

**III. THERE IS A GENUINE ISSUE OF MATERIAL FACT WHETHER MORRIS AND YANTOS SECURED CONSENT FROM COPAR PUMICE'S EMPLOYEE, ISMAEL GOMEZ, TO CONDUCT THEIR SEARCH AND SEIZURE.**

Because there are genuine issues of material fact whether the Defendants exceeded the scope

of the consent given in the permit, the Court needs to decide whether there are genuine issues of material fact whether Ismael Gomez,  Copar Pumice's employee, consented to the inspection and seizure.  The Defendants maintain that Ismael Gomez gave voluntary consent to the search and seizure.  See Motion for Summary Judgment at 10-15.  The Defendants contend that Ismael Gomez had both actual authority and apparent authority to consent to the inspection.  See Motion for Summary Judgment at 10-13.  The Court finds that there are genuine issues of material fact whether Ismael Gomez gave consent to Morris and Yantos to conduct the search and seizure, and whether he had actual or apparent authority to give such consent.  Thus summary judgment on this issue is denied.

A.    THERE IS A GENUINE ISSUE OF MATERIAL FACT WHETHER COPAR PUMICE'S EMPLOYEE, ISMAEL GOMEZ, HAD ACTUAL AUTHORITY TO CONSENT TO THE INSPECTION.

Despite the existence of genuine issues of material fact that are apparent in the pleadings and the record about the scope of the consent in the permit and the search made, the Defendants next argue that the Court can still grant them summary judgment because Copar Pumice gave additional consent at the site through Ismael Gomez.  To so rule, the Court must resolve the questions of actual and apparent authority on summary judgment.  The Court cannot resolve those issues on the record before it.  Accordingly, the Defendants are not entitled to summary judgment on Copar Pumice's Fourth Amendment claims.  The Court finds that there are genuine issues of material fact whether Ismael Gomez consented to the inspection, and even if he did consent to the inspection, the Court finds that there are genuine issues of material fact whether he had actual or apparent authority to do so.

To support their argument of actual authority, the Defendants rely upon a number of facts,

each of which is genuinely disputed.  For example, the Defendants contend that, when asked about the location of the records, Ismael Gomez led the Defendants to one of the two trailers located on the premises and freely entered the locked trailer.  See Morris Aff. ¶ 15, at 3.  On the other hand, Copar Pumice contends that Gomez had no conversation with the inspectors; that he did not understand the inspectors; and that he followed them into the trailer because he knew no one was in there to meet with them.  See I. Gomez Aff. ¶¶ 6-7, 16 at 2-3.  The Court cannot properly resolve this factual dispute on a motion for summary judgment.

Similarly, the Defendants contend that, once in the trailer, they observed Ismael Gomez operating equipment controls located there.  See Morris Aff. ¶ 19, at 4.  Copar Pumice contends that Ismael Gomez did not operate any equipment while he was in the trailer and, in fact, left the trailer once the inspectors began searching the trailer because he did not know what to do.  See I. Gomez Aff. ¶¶ 10, 13, at 2.  Again, the Court cannot properly resolve this factual dispute on a motion for summary judgment.

Another example is the Defendants' contention that Ismael Gomez and one other Copar Pumice employee were the only two individuals operating the facility that afternoon.  See Motion for Summary Judgment at 11; Morris Aff. ¶ 6, at 2. Copar Pumice contends that its plant foreman had left the mine for a dentist appointment.  See Salazar Aff. ¶ 4, at 1.  Copar Pumice alleges that, before the mine closed for the day, Ruben Velasco, the Assistant Operations Manager returned to the mine.  See Velasco Aff. ¶ 8, at 2.  As such, Copar Pumice asserts that Ismael Gomez and Elias Gomez were not the only two individuals operating the mine that afternoon.  The Court should not resolve this factual dispute on a motion for summary judgment.

Finally, the Defendants contend that Ismael Gomez stated that the manager was not present

at the site and could not be reached by telephone.  See Motion for Summary Judgment at 11; Morris Aff. ¶ 9, at 2.  Copar Pumice, in contrast, contends that Ismael Gomez had no conversations with Morris and Yantos.  See I. Gomez Aff. ¶ 16, at 3.  Copar Pumice alleges that, instead, Morris learned these facts from Copar Pumice's Safety Officer, Ralph Martinez, who advised Morris that Salazar was at a dentist appointment and after the appointment returned to his home in Ponderosa, New Mexico.  See Martinez Aff. ¶ 7, at 2.

The Defendants rely upon these disputed facts in stating that "these facts create a presumption that Mr. Gomez had control of the premises.  There is simply no indication that Mr. Gomez did not have control of the premises in general or the office/trailer specifically." Motion for Summary Judgment at 11.  The Defendants argue that, "the fact that he did not hesitate to enter the trailer, that he led the Defendants into the trailer, that the trailer was not locked, and that he displayed a familiarity with the equipment controls and the inside of the trailer all show that Mr. Gomez had mutual use of the premises by virtue of joint access." Id.  Inasmuch as these facts upon which the Defendants rely for actual consent are disputed, the Court cannot properly resolve the question of actual consent on summary judgment.  Genuine issues of material fact exist regarding the question of Copar Pumice's actual consent to the search and seizure given Ismael Gomez' testimony that he does not understand English, that he had no conversations with Morris and Yantos, and that he did not consent to the search or seizure of records.

**B.    THE REASONABLENESS OF ANY CONCLUSION OF APPARENT AUTHORITY IS A QUESTION OF FACT.**

The Defendants argue that, even if Ismael Gomez did not have actual authority to consent to the search, it was reasonable for the Defendants to believe that Ismael Gomez had the authority to consent.  See Motion for Summary Judgment at 11-13.  The same evidence that creates disputes

about actual authority, however, precludes summary judgment in the Defendants' favor on the question of apparent authority, because according to Ismael Gomez, there was no invitation or consent to search and seize records in the first place that would allow the court to proceed to the second inquiry of apparent authority.  Genuine issues of material fact exist regarding the question of Copar Pumice's actual consent to the search and seizure.

Additionally, the Court is concerned that, because the Defendants' first argument is that no consent was required, this rationale is an after-the-fact justification for the Defendants' warrantless search and seizure.  In addition, when Copar Pumice's safety officer confronted Morris about their warrantless search and seizure, Morris argued that he was authorized to seize records because the permit required Copar Pumice to deliver the records upon request.  See Martinez Aff. ¶ 5, at 2. Thus, both the Defendants' legal arguments as well as the facts permit the reasonable inference that Morris and Yantos did not evaluate the question of Ismael Gomez' authority to consent during their August 28, 2006 inspection.

Copar Pumice's evidence raises the inference that the individual who is alleged to have consented or had the apparent authority to consent is a Mexican national who speaks only Spanish and does not understand English; is employed as a laborer, had been so employed for only six months, and has no supervisory authority; was repairing a piece of equipment when the inspectors arrived; was shown no form of identification; had no conversations with Morris and Yantos; did not understand any of the statements that Morris and Yantos made; did not consent to the search; followed, and did not lead, the inspectors into the trailer; and left when they began searching the trailer because he did not know what to do. See I. Gomez Aff. ¶¶ 1-16, at 1-3. Given these possible facts and circumstances, the reasonableness of the Defendants' alleged belief of apparent authority

is a question of fact to be decided at trial, and the Court cannot resolve this issue on summary

judgment.  While the Court cannot say on the record whether the issue would be resolved in the

Defendants' favor, the important consideration at this stage is that the Court should not resolve the

issue on summary judgment.  Accordingly, the Court cannot say that Copar Pumice, through Ismael

Gomez, as a matter of law, consented to the full scope of the search and seizure.

### C.  THERE IS A GENUINE ISSUE OF MATERIAL FACT WHETHER ISMAEL GOMEZ VOLUNTARILY CONSENTED TO THE INSPECTION.

Furthermore, the Court believes that, even if Ismael Gomez had actual or apparent authority,

there is a genuine issue of material fact whether he voluntarily consented to the inspection.  To

determine whether consent was voluntarily given is a question of fact based upon the totality of the

circumstances.  See Schneckloth v. Bustamonte, 412 U.S. at 227.  The Tenth Circuit has determined

that, for consent to be voluntary, two conditions must be met: "[(i)] There must be a clear and

positive testimony that consent was unequivocal and specific and freely given; and [(ii)] The

government must prove consent was given without duress or coercion, express or implied."  United

States v. Guerrero, 472 F.3d at 789.  The Defendants contend that Ismael Gomez had a working

knowledge of English and thus was sufficiently fluent in English to knowingly and voluntarily

consent to the inspection.  See Motion for Summary Judgment at 15.  Ismael Gomez contends:

> Since I do not speak English and they did not speak Spanish, I did not learn where
> the inspectors were from or what they wanted. . . . After saying some words to me
> which I did not understand, the inspectors walked into the trailer at the mine . . . I did
> not lead the inspectors into the trailer at the mine. . . . I did not give the inspectors
> permission to look through the trailer . . . If Mr. Morris explained to me that he was
> going to walk around the facility to complete his inspection, I did not understand that
> statement because I do not speak English. . . . I did not have any conversations with
> the inspectors.

I. Gomez Aff. ¶¶ 7, 9, 14, 16, at 2-3.  The Court believes that these sworn statements by Ismael

Gomez raise genuine issues of material fact whether he voluntarily consented to the inspection of Morris and Yantos.

**IT IS ORDERED** that the Defendants' Motion for Summary Judgment is granted in part and denied in part. There is no disputed issue of material fact that Copar Pumice consented to a warrantless search of its site conducted in compliance with the Air Quality Permit and relevant state statute. Thus, the Court will grant summary judgment on the question whether Copar Pumice consented to a warrantless search as permitted by the permit and statute. There is a genuine issue of material fact, however, whether Morris and Yantos' search and seizure exceeded Copar Pumice's consent under the permit, and whether Ismael Gomez gave consent for the search and seizure that was conducted. Accordingly, the Court denies the remainder of the summary judgment motion.


_____
UNITED STATES DISTRICT JUDGE


*Counsel:*

Holly A. Hart
Kristin L. Davidson
Scheuer, Yost & Patterson
Santa Fe, New Mexico

    *Attorneys for the Plaintiff*


Jerry A. Walz
Walz and Associates
Cedar Crest, New Mexico

    *Attorneys for the Defendants*