IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

COPAR PUMICE COMPANY, INC.,

                Plaintiff,

vs.                                                    No. CIV 07-0079 JB/ACT

ALLAN MORRIS, in his individual capacity,
DAVID YANTOS, in his individual capacity,
MARY UHL, in her individual capacity,
DEBRA MCELROY, in her individual capacity,
and RON CURRY, in his individual capacity as
Secretary of the New Mexico Environment
Department,

                Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Motion for Summary Judgment on Behalf of Mary Uhl and Debra McElroy on the Basis of Qualified Immunity, filed November 20, 2008 (Doc. 75). The Court held a hearing on February 11, 2009. The primary issues are: (i) whether there is a genuine issue of material fact whether Defendants Mary Uhl and Debra McElroy had any personal involvement in the conduct that Plaintiff Copar Pumice Company, Inc. contends was a violation of equal protection; (ii) whether there is a material difference in the way Uhl and McElroy treated Copar Pumice and any allegedly similarly situated entity; and (iii) whether there is an objectively reasonable and legitimate governmental reason for the actions that Uhl and McElroy allegedly took. The Court concludes that there is a genuine issue of material fact whether Uhl and McElroy were involved in the activities, but because the Court concludes that there are material differences between Copar Pumice and the allegedly similarly

situated entities, and because the Court also concludes that Uhl and McElroy have presented objectively reasonable and legitimate government reasons for what they have done, the Court will grant the motion for summary judgment on behalf of Uhl and McElroy on the basis of qualified immunity.

## FACTUAL BACKGROUND

Copar Pumice is a New Mexico corporation maintaining its principal place of business in Rio Arriba County, New Mexico. See Amended Complaint for Violation of Civil Rights, ¶ 4, at 2, filed January 23, 2007 (Doc. 36)("Amended Complaint"). McElroy is the Compliance and Enforcement Section Chief of the New Mexico Environment Department's Air Quality Bureau ("NMED"), and Uhl is Chief of the Bureau. See Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment at 1, filed December 22, 2008 (Doc. 80)("Response"). This case concerns a dispute over the manner in which NMED conducted a compliance inspection of Copar Pumice's pumice-screening facility near Jemez Springs, New Mexico, and the subsequent assessment of fines for alleged non-compliance with Copar's Air Quality Permit. See Complaint ¶¶ 8-20, at 2-4.

On August 28, 2006, Defendants NMED Environmental Compliance Specialist Allan Morris  and NMED employee David Yantos entered land Copar Pumice leases from the United States Forest Service where Copar Pumice was operating a pumice-screening plant. See Memorandum in Support of Motion for Summary Judgment on Behalf of Mary Uhl and Debra McElroy on the Basis of Qualified Immunity at 13, filed November 20, 2008 (Doc. 76)("Memorandum in Support"). At this time, Adrian Salazar, a plant manager, was at a dental appointment and not on the premises. See Complaint ¶ 8, at 2. While many details are disputed, it is not disputed that Morris and Yantos entered a trailer on the site of the screening facility,

removed some records from the trailer, and left the site.  See Complaint ¶¶ 9-10, at 2. Morris and Yantos also conducted an inspection of the screening facility at this time. See Affidavit of Allan Morris ¶¶ 5-11, at 2-3 (executed November 19, 2009)(Doc. 76-3)("Morris Aff.").

During the August 28, 2006 inspection, Morris concluded that Copar Pumice was in violation of a number of permit conditions. See Morris Aff. ¶ 9, at 2.  Following this inspection, Morris drafted a Notice of Violation stating that Copar was in violation of six permit conditions. See Notice of Violation, filed November 20, 2008. (Doc. 76-3, Attachment 2).  This notice is dated October 30, 2006. See Memorandum in Support ¶ 15, at 5.

Copar Pumice contends that, as a direct result of this Complaint against NMED, McElroy and Uhl "intentionally began to treat Copar differently than other similarly situated mine permitees."  Complaint, ¶ 18 at 4. Specifically, Copar Pumice alleges that the Defendants "conspired and agreed" to "arbitrarily and maliciously" issue Copar Pumice notices of violation alleging violations of Copar Pumice's mining permit. Id. at ¶ 19, at 4. Further, Copar Pumice alleges that the Defendants "arbitrarily, capriciously, and maliciously" construed Copar Pumice's mining permit to prohibit activities which had been allowed during the previous sixteen years, and that the Defendants interpreted the permits to contain additional requirements not described within the permits.  Id. ¶ 19, at 4.  These interpretations resulted in draft civil penalty calculations for seven violations itemized in the Second Notice of Violation, and included penalties totaling $81,912.00. See Response ¶¶ 6-7, at 5.  These penalties were subsequently revised upwards to a final total of $149,744.00.  See id. ¶ 9 at 6.

In response to this notice of violation and the alleged mistreatment of Copar Pumice by Uhl and McElroy, Copar Pumice amended their initial Complaint to include allegations that McElroy and Uhl had "conspired and agreed to arbitrarily, capriciously and maliciously issue

Copar seven (7) notices of violation alleging violation of Copar's mining permit." Amended Complaint ¶ 19, at 4. The motion before the Court seeks to dismiss the case against Uhl and McElroy on grounds of qualified immunity.

## PROCEDURAL BACKGROUND

As a result of the inspection and removal of documents, on January 26, 2007, Copar Pumice filed a Complaint against Morris, Yantos, and Defendant Ron Curry, Secretary of the NMED. See Complaint ¶¶ 5-7, at 2. This suit is a civil rights action under 42 U.S.C. §1983 seeking redress for violations of the Fourth and Fourteenth Amendments to the United States Constitution and of Article 2, §10 of the New Mexico Constitution. See Amended Complaint ¶ 1, at 1. In this action, Copar Pumice makes various claims, including that the removal of its records constituted an unreasonable search and seizure, and thus violated the Fourth Amendment to the United States Constitution. Following, or at about the same time as, the filing of this Complaint, NMED revised its Notice of Violation, adjusting the violations themselves slightly and increasing the total amount of the fines assessed. See Amended Complaint ¶¶ 16-20 at 3-4.

Following this Complaint and the alleged improper treatment of Copar Pumice by Uhl and McElroy, Copar Pumice amended its Complaint. In the Amended Complaint, Copar Pumice added Uhl and McElroy as Defendants in their individual capacities. See Amended Complaint ¶¶ 7-8, at 2. In this Amended Complaint, filed pursuant to 42 U.S.C. § 1983, Copar Pumice seeks redress for violations of the Fourth and Fourteenth Amendments to the United States Constitution and for violations of Article 2, §§ 10 and 18 of the New Mexico Constitution. Additionally, Copar Pumice in this Amended Complaint alleges that the Defendants' assessment of fines, and especially the increase of those fines, "directly resulted from Copar's exercise of its constitutionally protected rights to object to the unlawful entry on its premises and seizure of its

records in the administrative penalty proceedings and to file this lawsuit."  Amended Complaint ¶ 16, at 3-4. Uhl and McElroy now move the Court for summary judgment on the claims made against them on the basis of qualified immunity.

On the briefs, the Defendants argue that, to succeed on its equal-protection claim, Copar Pumice must prove two things.  First, they argue, Copar Pumice must prove that it was singled out for persecution by the Defendants because of animosity or a "spiteful effort to get Plaintiff for reasons wholly unrelated to any legitimate state activity."  Memorandum in Support at 9 (internal quotation marks omitted). Second, the Defendants argue that Copar Pumice must prove that it was treated differently than other entities "similarly situated in every material respect."  Id.  The Defendants go on to argue that, if there is an objectively reasonable basis for their actions, or if there is any material difference between Copar Pumice and other allegedly "similarly situated" entities, summary judgment is appropriate. Id. at 10.

The Defendants argue that the undisputed material facts show that neither Uhl nor McElroy had any personal involvement in the initiation of enforcement proceedings against Copar Pumice, or in the calculation of draft penalty assessments against Copar Pumice, and that without their involvement, there can be no §1983 case against them. See Memorandum in Support at 10. Further, the Defendants argue that the undisputed material facts show that there was an objectively reasonable  and rational basis for the finding of violations and the assessment of fines against Copar Pumice, and that Copar Pumice therefore cannot, as a matter of law, prevail on the equal protection claim. See id. at 12-14. Finally, the Defendants argue that there is no evidence that any entity similarly situated in every material respect to Copar Pumice has been treated differently than Copar Pumice has been treated, and that Copar Pumice therefore also cannot, as a matter of law, prevail on its class-of-one claim.  See id. at 15.

Copar Pumice argues in its brief that the facts which the Defendants characterize as undisputed are not only disputed, but wrong.  <u>See</u> Response at 3.  Copar Pumice argues that the Defendants, while recognizing that they have the initial burden to show that there is an absence of evidence, have not met that burden.  <u>See</u> <u>id.</u> at 8.  Copar Pumice also points to the Defendants' recognition of the two-part analysis proper for the qualified-immunity defense: that the plaintiff must demonstrate that a constitutional violation occurred and that the right violated was clearly established at the time of the unlawful conduct.  <u>See</u> <u>id.</u> at 8-9.  Unlike the Defendants, however, Copar Pumice argues that there are no undisputed material facts demonstrating that the Defendants did not violate Copar Pumice's right to equal protection and that Copar Pumice's right to be free of such violations was clearly established at the time.  <u>See</u> <u>id.</u>  On this basis, Copar Pumice argues that the Court should deny the motion for summary judgment.

Specifically, Copar Pumice argues that Uhl and McElroy were personally involved in the enforcement actions against Copar Pumice.  <u>See</u> Response at 9-10.  As evidence of McElroy's involvement, Copar Pumice notes that she signed the first Notice of Violation.[1]  As evidence of Uhl's involvement, Copar Pumice suggests that the Air Quality Bureau would not have turned the matter over to the Environmental Protection Division if Uhl had reprimanded her subordinates for issuing those penalties.  Copar Pumice also submits several emails that it contends prove the Defendants' involvement in the dispute.

---

[1] This fact is also contested.  <u>See</u> Transcript of Hearing at 7:16-25 (taken February 11, 2009)(Walz)("Tr.").  The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

With regard to the "objectively reasonable" question, Copar Pumice's brief states that the reasonableness of Morris' conduct has no bearing on the reasonableness of McElroy or of Uhl's conduct. See Response at 11. Copar Pumice argues that, because the Defendants' brief focuses on the objective reasonableness of Morris' actions, it presents no argument that McElroy and Uhl should be entitled to qualified immunity. See id. Finally, Copar Pumice argues that the evidence it has presented showing the fines assessed against it, and fines assessed against Copar Pumice in the past and against other allegedly similarly situated entities, demonstrate that Copar Pumice has been treated differently than similarly situated entities. See id. at 12.

At the February 11, 2009 hearing, Joseph Manges, counsel for Copar Pumice, emphasized the comparison between Copar Pumice in this case and the various other entities alleged to be similarly situated to Copar Pumice. See Transcript of Hearing, passim (taken February 11, 2009)("Tr."). He stated that New Mexico Environment Department Air Quality Bureau Civil Penalty Policy (Exhibit E, filed January 20, 2009 (Doc. 84-2)("Policy")) states as its purpose the assurance of fair and consistent determination of civil penalties; to impose civil penalties in proportion to the gravity of the violation; and to ensure a level playing field for economic competitors. See Tr. at 29:1-12. He argued that, using these goals as a barometer, NMED had stepped outside its policy and had failed to respect these goals. His contention is that the apparent discrepancy between the fines assessed against Copar Pumice in this case, and the fines assessed against other allegedly similarly situated entities in other cases, is evidence of NMED's failure to abide by the policy. See id. at 29:1-22. Mr. Manges further argued that the fact that this case is essentially ongoing -- that is, it has not yet reached a point of settlement, administrative hearing, or final determination by a court, as have the other examples submitted -

- is immaterial, because the currently assessed fine of $149,744.000 is the fine that NMED is willing to accept in settlement of this case.  See id. at 30:18-23, 31:23-25.  He argues that, because the NMED has assessed this amount, it is appropriate to compare that total to the total fines that other entities have paid in disputes with NMED.  See id. at 30:18-23.

Jerry Walz, counsel for the Defendants, conceded that there could be a genuine issue of material fact regarding the Defendants' personal involvement, while maintaining that the Defendants had done nothing inappropriate. See Tr. at 61:2-9. He emphasized in his arguments that the fines shown in the examples of allegedly similarly situated entities submitted by Copar Pumice are fines which have been reduced by settlements. See id. at 13:1-8. He also emphasized that the structure of the Policy with regard to the calculation of fines takes into account many variables, which he argues proves Copar Pumice's failure to present evidence of similarly situated entities being treated differently than Copar Pumice itself has been treated here. See Tr. at 23:6-25, 24:1-13.

## STANDARD FOR DECIDING SUMMARY JUDGMENT MOTIONS

A motion for summary judgment should be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c). The Supreme Court of the United States has held that "the plain language of [Rule 56(c) of the Federal Rules of Civil Procedure] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The essential function of the rule is to provide a threshold for determining whether there is the need

for a trial; that is, whether there are genuine factual issues which, because they could reasonably be resolved in favor of either party, can only be properly resolved by a finder of fact. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). The proper inquiry for the judge on a motion for summary judgment, then, is "whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." Id. (italics in original)(citing Improvement Co. v. Munson, 81 U.S. 442 (1872)).

The obligation of the moving party is to inform the District Court of "the basis of its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. at 323. The motion may be presented with or without supporting affidavits. See id. at 324.

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity is available as a defense to public officials whose jobs involve discretionary action that might subject them to the wrath of members of the public who run afoul of their discretionary actions. See Harlow v. Fitzgerald, 457 U.S. 800, 808 (1982). In Harlow v. Fitzgerald, the Supreme Court stated that

> . . .the recognition of a qualified immunity defense for high executives reflected an attempt to balance competing values: not only the importance of a damages remedy to protect the rights of citizens, but also the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exerci

Harlow v. Fitzgerald, 457 U.S. at 808 (internal quotation marks omitted).

Qualified immunity is recognized not only as a protection from liability but as an immunity from suit, as the law recognizes that the ordeal of trial itself could have a dampening

effect on important government functions if it could be held above the heads of public officials.
See Mitchell v. Forsyth, 472 U.S. 511 at 527.

### 1.    **Rationale for the Doctrine of Qualified Immunity.**

The doctrine of qualified immunity exists to balance competing interests. The law recognizes both "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 129 S. Ct. 808 (2009). There is a tension between permitting legitimate complaints and preventing anyone unhappy with an official's decision from turning their dissatisfaction into a lawsuit. In Harlow v. Fitzgerald, the Supreme Court concluded that bare allegations of malice

> should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery . . . . We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known,

Harlow v. Fitzgerald, 457 U.S. at 818.

Under this standard, as long as the discretionary function of those officials "does not violate clearly established statutory or constitutional rights of which a reasonable person should have known," the officials in question should be shielded from liability under the qualified immunity defense.  Harlow v. Fitzgerald, 457 U.S. at 818.

Since Harlow v. Fitzgerald, courts have struggled with the meaning and application of the qualified-immunity doctrine, and with the role of the malice or intention element. In Crawford-El v. Britton, 523 U.S. 574 (1998), the Supreme Court attempted to clarify the appropriate line between barring frivolous cases and protecting the rights of wronged citizens.

There, the Supreme Court noted that "[t]he immunity standard in Harlow itself eliminates all motive-based claims in which the official's conduct did not violate clearly established law." Crawford-El v. Britton, 523 U.S. at 592. The Court then goes on to describe two ways in which the qualified immunity doctrine can "facilitate" summary judgment. First, where there is doubt as to the illegality of the defendant's conduct; second, when despite proof of an improper motive, "proof of an improper motive is not sufficient to establish a constitutional violation." Id. at 593.

### 2. Heightened Pleading Standards in Qualified Immunity Cases.

Before Crawford-El v. Britton, the United States Court of Appeals for the Tenth Circuit required a "heightened pleading" standard for qualified-immunity cases in which an improper motive for the official action was alleged.  In Currier v. Doran, 242 F.3d 905, 916 (10th Cir. 2001), however, the Tenth Circuit held that Crawford-El v. Britton prevents courts from establishing heightened-pleading standards in qualified-immunity cases. Instead, the Currier v. Doran Court found, the Supreme Court in Crawford-El v. Britton combines a rejection of deviations from the Federal Rules of Civil Procedure, i.e., heightened pleading standards, with an instruction to federal district judges to exercise their discretion, under the Federal Rules, to manage cases in a way which best serves the purpose of the qualified immunity doctrine and citizen's rights. See Currier v. Doran, 242 F.3d 905 at 915-16.  Appropriate application of the qualified-immunity doctrine is therefore essentially a threshold question; the Court must determine the qualified-immunity issue regarding whether applying this doctrine would in the case in question meet the balancing test of protecting citizen's rights without subjecting public officials to inappropriate harassment.  See id. at 913-14.

-11-

3.      **Two-Part Test for Qualified Immunity**.

In the recent case Pearson v. Callahan, the Supreme Court modified what was previously a mandatory two-pronged test for the application of a qualified immunity question into a guideline. Under the prior test, from Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court had required that a court must first determine "whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right, and, [second] if so, whether that right was "clearly established" at the time of the defendant's alleged misconduct." Pearson v. Callahan, 129 S. Ct. at 816 (citing Saucier v. Katz). Noting that this mandatory two-step framework has been widely criticized by lower courts on practical, procedural, and substantive grounds, the Supreme Court in Pearson v. Callahan overruled Saucier v. Katz to the extent that this two-part test had been mandatory.  See Pearson v. Callahan, 129 S.Ct. at 813.

The current law, therefore, requires judges of the lower courts "to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 129 S. Ct. at 818.  The goal of this holding was to allow district courts to more effectively apply the doctrine of qualified immunity by permitting those courts to dispose of cases on the basis of either of the two prongs, rather than obligating them to address both questions.  The Pearson v. Callahan Court recognized that in some cases both questions are important, and that judges are free to use both prongs of the test where appropriate.  See id. at 818.

The Tenth Circuit recognizes that "[r]equiring the law to be clearly established provides defendants with fair warning that their conduct is unconstitutional." Mimics, Inc. v. Vill. of Angel Fire, 394 F.3d 836, 842 (10th Cir. 2005)(citing Hope v. Pelzer, 536 U.S. 730, 739-740 (2002)).  The Tenth Circuit in Mimics, Inc. v. Vill. of Angel Fire, 394 F.3d at 842 went on to

-12-

note that even where the law was clearly established at the time of the challenged conduct that qualified immunity might be appropriate where there were "extraordinary circumstances." "Exceptional circumstances which may render an official's conduct objectively reasonable and therefore justify qualified immunity include a reliance on a state statute or regulation." Id. This exception points towards the heavy burden put upon a plaintiff attempting to overcome a qualified immunity defense.

### LAW REGARDING EQUAL PROTECTION AND CLASS-OF-ONE CLAIMS

The Supreme Court has "recognized successful equal protection claims brought by a class of one, where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Willowbrook v. Olech, 528 U.S. 562, 564 (2000). The classic "class of one" case is one in which a public official inflicts or imposes a burden or cost of some sort on one person or entity without imposing the same burden or cost on other similarly situated persons or entities. See Lauth v. McCollum, 424 F.3d 631, 633 (7th Cir. 2005).

Class-of-one cases have presented a challenge to the lower courts since the Supreme Court established the doctrine in Willowbrook v. Olech. See Jennings v. City of Stillwater, 383 F.3d 1199, 1211 (10th Cir. 2004). The lower courts have recognized the risk that, "unless carefully circumscribed, the concept of a class-of-one equal protection claim could effectively provide a federal cause of action for review of almost every executive and administrative decision made by state actors." Id. at 1211-12. The Tenth Circuit recognized in Jennings v. City of Stillwater that it is nearly always possible for persons aggrieved by a government action to produce evidence of being treated differently than others, and that it is always possible to allege such differential treatment. See id.

Recognizing the fraught nature of the claim, the circuits have "proceeded cautiously in applying this theory." Jicarilla Apache Nation v. Rio Arriba County, 440 F.3d 1202, 1209 (10th Cir. 2006). The Tenth Circuit in Jicarilla Apache Nation v. Rio Arriba County cautioned that "[a]n approach that reads Olech too broadly could transform the federal courts into general-purpose second-guessers of the reasonableness of broad areas of state and local decisionmaking: a role that is both ill-suited to the federal courts and offensive to state and local autonomy in our federal system." Jicarilla Apache Nation v. Rio Arriba County, 440 F.3d at 1209 (citing Jennings v. City of Stillwater, 383 F.3d 1199 (10th Cir. 2004))(internal quotation marks omitted).

The law of equal protection traditionally deals with "groups unified by the characteristic alleged to be at the root of the discrimination." Jennings v. City of Stillwater, 383 F.3d at 1213. Where a group is involved, the problem is simplified; in this traditional situation, "the sample size is large enough to raise a concern that the disfavored class was selected . . . because of their membership in the class." Id. at 1213. A unique feature of the class-of-one claim is that it essentially exempts plaintiffs from proving membership in one of these groups; rather, they need only prove that he or she is "similarly situated" to other individuals or entities who have been treated more favorably. Addressing this unique characteristic of these claims, the Tenth Circuit in Jennings v. City of Stillwater noted that "[i]t is therefore imperative for the class-of-one plaintiff to provide a specific and detailed account of the nature of the preferred treatment of the favored class." 383 F.3d at 1214.

## ANALYSIS

Where the moving party will bear the burden of persuasion at trial, that party must support its motion with evidence which, if not disproved, would entitle that party to a directed

verdict. Such evidence shifts the burden of proof to the party opposing the motion and requires that party to produce evidence of a "genuine fact" for trial. Anderson v. Health and Human Servs., 907 F.2d 936 (10th Cir. 1990). "After a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff." Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001). Thus, in this case, Copar Pumice bears the burden of disproving the Defendants' entitlement to the qualified-immunity defense.

Copar Pumice alleges that Uhl and McElroy have singled out Copar Pumice for persecution, assessing harsher penalties against Copar Pumice than against other similarly situated entities, and that there is no basis for these actions besides malice resulting from Copar Pumice's filing of a civil rights action against the Defendants. See Amended Complaint ¶¶ 17-20, at 4.  To prevent the Defendants' successful use of the qualified-immunity doctrine, Copar Pumice must prove two things. First, Copar Pumice must prove that it is similarly situated to other entities which have been treated differently. In other words, Copar Pumice must show that there are no material differences between it and other entities whom NMED treated differently. Second, Copar Pumice must prove that there is no rational basis for the difference in treatment. Jicarilla Apache Nation v. Rio Arriba County, 440 F.3d at 1202.

The burden on Copar Pumice in this case is similar to the burden that the Jicarilla Apache Nation faced Jicarilla Apache Nation v. Rio Arriba County. There, the Tenth Circuit considered "whether the defendants advanced grounds that are not irrational and wholly arbitrary for the County's decision to reassess the Chama Ranch without similarly reassessing other properties, and [second] whether the compared properties were similarly situated in every material respect." Jicarilla Apache Nation v. Rio Arriba County, 440 F.3d 1202 at 1210 (internal quotation marks omitted). Under this standard, Copar Pumice must prove first that NMED had no grounds for

assessing the fines they assessed which were not irrational and wholly arbitrary; and second, that Copar Pumice is similarly situated in every material respect to other entities which received different treatment from NMED. If Copar Pumice is unable to prove both of these issues, summary judgment will be appropriate. See id. As a threshold issue, Copar Pumice must demonstrate at least an "affirmative link" between the Defendants and the actions of which Copar Pumice complains. Fogarty v. Gallegos, 523 F.3d 1147, 1163 (10th Cir. 2008)(citing Butler v. Norman, 992 F.2d 1053 (10th Cir. 1993)).

An initial threshold issue which must be addressed pertains to the Defendants' involvement in NMED's action against Copar Pumice. Copar Pumice's action against the Defendants is based on allegations of their intentional discriminatory treatment of Copar Pumice. To prevail on a damages claim for a constitutional violation, a plaintiff must establish that the defendant "caused or contributed to" the alleged violation. Jenkins v. Wood, 81 F.3d 988 at 995. "In situations where an affirmative link exists between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise, the supervisor may be personally liable." Fogarty v. Gallegos, 523 F.3d at 1163 (citing Butler v. Norman). Thus, at a minimum there must be some "affirmative link" between the official and the alleged action.

## I.   THERE ARE GENUINE ISSUES OF MATERIAL FACT REGARDING THE DEFENDANTS' PERSONAL INVOLVEMENT IN THE CASE.

Defendants' Memorandum in Support alleges that the undisputed material facts show that neither Uhl nor McElroy had any personal involvement in the relevant actions. See Memorandum in Support at 10. Mr. Manges stated at oral argument that both interrogatories and emails submitted as plaintiff's exhibits present evidence that Uhl and McElroy had some

involvement with the case. <u>See</u> Tr. at 9:10-25, 10:1-11. At the February 11, 2009 hearing, the Court determined that the evidence presented a genuine issue of material fact on the Defendants involvement in the case. <u>See.</u> Tr. at 14:9-10. Several pieces of evidence persuade the Court as to this fact.  This evidence includes a letter from Holly Hart, former counsel for Copar Pumice, to Uhl regarding Administrative Review of Notice of Violations ("Letter Regarding Administrative Review")(Plaintiff's exhibit B)(filed December 22, 2009)(Doc. 80-3)(showing that Uhl was aware of Copar Pumice's complaints about the assessed fines). This evidence also includes emails between McElroy, Morris, and other individuals in which McElroy asks questions regarding specific permit conditions regarding dust and road treatment. These emails are dated between February 5th, 2007 and September 15, 2008. <u>See</u> Copar's Motion to Supplement Copar's Response to Motion for Summary Judgment, Exhibit P, filed February 9, 2009 (Doc. 88)("Motion to Supplement")[2](showing that Uhl and McElroy were kept apprised of and to some extent were active in discussions of the case). Another set of emails is between a citizen near the Copar Pumice screening facility and Uhl, McElroy, and other NMED officials regarding specific citizen complaints about Copar Pumice and questions about their permits, showing again that Uhl and McElroy were aware of and to some extent active in discussions about the case. <u>See</u> Motion to Supplement, Exhibit Q. Because these various exhibits present evidence of communications between the Defendants and other parties regarding the action against Copar Pumice, the Court finds that there is a genuine issue of material fact regarding the personal involvement of the Defendants. Further, Mr. Walz agreed to stipulate that Uhl and McElroy at least had some knowledge and involvement in the case. <u>See</u> Tr. at 61:1-9.

---

[2] The Court granted this motion  at the February 11, 2009 hearing.

While the Court finds that Copar Pumice has presented evidence which demonstrates that there is a genuine issue of material fact regarding the personal involvement of Uhl and McElroy in the actions against Copar Pumice, this threshold determination does not preclude Uhl and McElroy's entitlement to the qualified-immunity defense. Uhl and McElroy may have been personally involved in the case and still be entitled to the qualified immunity defense. The Court will therefore proceed to examine the motion on the merits.

## II.  THE DEFENDANTS' ACTIONS WERE OBJECTIVELY REASONABLE, AND THERE ARE LEGITIMATE GOVERNMENT REASONS FOR THOSE ACTIONS.

The first question to address in a class-of-one claim is whether there is any rational basis for the Defendants' actions. In Willowbrook v. Olech, the Supreme Court articulated the standard as whether the action taken was "irrational and wholly arbitrary." Willowbrook v. Olech, 528 U.S. at 564.

The duty of NMED officials in this context is twofold. First, NMED officials must ensure compliance with the Air Quality Control Act and with the terms of permits issued to industry. Second, the officials must assess civil penalties for violations of the Air Quality Control Act and Air Quality Control Regulations.  Copar Pumice does not contest that these two duties constitute NMED's role, nor that its pursuit of these goals is reasonable.  Rather, Copar Pumice's argument is that the fines were assessed solely because of the animus Uhl and McELroy held for Copar Pumice as a result of the civil-rights action Copar Pumice filed against NMED. See Amended Complaint ¶¶ 17-19 at 4.  As evidence of the "irrational and wholly arbitrary" nature of the fines assessed against Copar Pumice, Mr. Manges points specifically to discrepancies between fees assessed against Copar Pumice in this action and fees paid by other permitees in previous actions. See Response ¶¶ 7-14 at 5-8. Copar Pumice emphasizes language in the Policy which

-18-

states that one of the goals of the Policy is to ensure "fair and consistent" fines "proportional to the gravity of the violation," and that penalties must "ensure a level playing field for economic competitors." Id. ¶ 14 at 8. While these goals are stated in the Policy, there are other stated goals as well: "The Policy is used to determine the civil penalty in enforcement action . . . . [A] primary purpose of enforcement is to deter noncompliance." Policy at 3. "In some cases, it may be better to close down a violator meeting one or more of these circumstances rather than allowing it to continue to violate the law or harm public health or environment." Id. at 17. Suggesting closure of a company as one of the legitimate and stated goals in the Policy makes clear that the goals cited by Copar Pumice are to be understood in a larger context. In light of these stated goals, especially the deterrence of noncompliance, there is a certain irony to Copar Pumice's argument that the penalties are unfair because they are larger than those assessed against Copar Pumice in the past for similar violations.

Examining one of the specific violations in detail is revealing. One violation with which Copar Pumice and another similar company are charged relate to record-keeping violations. At oral argument, Mr. Manges stated that the fine assessed against Copar Pumice for record-keeping violations is $81,000.00, an "enormous" difference compared to a fine assessed against Espanola Transit Mix of $5,400.00 for similar record-keeping violations. See Tr. at 36:24-37:8 (Manges). The specific facts of these two violations, however, demonstrate both that the two situations are not comparable and that there is no reason to believe that the NMED's assessment is "irrational and wholly arbitrary."

It is true that Espanola Transit Mix was fined $5,400.00 for "failure to complete and maintain proper production records and roadway surfactant application records." Exhibit J at 5 (Doc. 80-11)("Espanola Transit Mix NOV"). The detailed explanation of this violation notes

that Morris requested and received production logs for a three month period which did not include certain required information.  See id.  As Mr. Manges noted at oral argument, this failure resulted in a three-month violation.  See Tr. at 37:4-5. This problem resulted in a fine of $60.00 per day for ninety days or $90.00 per day if one assumes twenty operating days per month.

Two separate fines were assessed against Copar Pumice for record-keeping violations, which together total $81,504.00: "Failure to keep records of frequency of application of water or equivalent [dust] control measures," and "failure to keep daily operating records for the most recent 3-year period on site and available to department on request."  First Amended Compliance Order Requiring Compliance and Assessing a Civil Penalty at 7, filed December 22, 2008,(Doc. 80-6)("First Amended Compliance Order"). Changing the description of the violation from the initial Compliance Order, this document states that Copar Pumice was in violation of each of these two permit conditions every operating day for a three-year period.  See id. ¶¶ 24, 27, at 5. This revision is permitted by the Policy in footnote 1, page 4: "The AQB should make the most aggressive assumptions regarding noncompliance warranted by the facts. The AQB may revise these assumptions on the basis of facts discovered during the enforcement action." The total fine assessed for each of these violations -- the highest fine assessed among those in the current enforcement action -- is $40,752.00. See id., ¶¶ D, E at 7. For each fine, this figure results in a daily fine of $37.22 -- counting all days in the three-year period, or 1,095 days -- or $54.34 assuming 250 operating days per year, for a total of 750 days.

Given the many factors NMED is expected to take into account, the variations in the facts between different alleged violations, and the discretionary elements allowed NMED officials, the Court here finds that there is an objectively reasonable and legitimate reason for the fines assessed. While not all of the individual violations and fines submit to examination so easily as

this one, on balance the Court finds that the variation between fines assessed do not approach the threshold necessary to merit a finding of "irrational and wholly arbitrary." This conclusion finds support in the fact that the present dispute represents an ongoing action and the fines may yet be revised, either through a settlement negotiation, at an administrative hearing, or through a final appeal.

The Court concludes that the Uhl and McErloy have presented objectively reasonable and legitimate government reasons for what they have done. Given objectively reasonable and legitimate government actions based on NMED's duty to enforce the air quality standard of New Mexico, the Court finds that Uhl and McElroy have advanced grounds for their decisions that are not irrational and wholly arbitrary. Accordingly, Uhl and McElroy have met their burden under the first prong of the two-part test in Jicarilla Apache Nation v. Rio Arriba County.

## III.   COPAR PUMICE HAS NOT SHOWN THAT IT IS SIMILARLY SITUATED TO OTHER ENTITIES WHICH NMED HAS TREATED DIFFERENTLY.

In a successful class-of-one claim, the plaintiff must show that they are in all material respects similarly situated to other entities or individuals whom a state actor has treated differently. See Jennings v. City of Stillwater, 383 F.3d 1199 (10th Cir. 2004). "In the paradigmatic class-of-one case, a public official inflicts a cost or burden on one person without imposing it on those who are similarly situated in material respects, and does so without any conceivable basis other than a wholly illegitimate motive." Lauth v. McCollum, 424 F.3d 631, 633 (7th Cir. 2005). Copar Pumice alleges this situation, contending that the fines assessed for alleged violations of its permit conditions are much harsher than fines assessed against other similarly situated entities for similar violations, and that these fines are also much harsher than

fines assessed against Copar Pumice itself for previous violations.   See Amended Complaint ¶¶18-20, at 4.

In the context of a rule 56(c) motion for summary judgment, it is important to note that the motion may only be granted if a party is entitled to judgment as a matter of law and there are no genuine issues of material fact.  See Celotex Corp. v. Catrett, 477 U.S. at 322.  The party moving for summary judgment -- here Uhl and McElroy -- has the initial burden of showing the absence of any genuine issue of material fact and entitlement to judgment as a matter of law.  See Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670-71 (10th Cir. 1998).  The moving party can meet this burden "by showing -- that is, by pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S. at 317.  In this case, Uhl and McElroy have met that burden.

If the moving party meets the burden, as Uhl and McElroy does in this case, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.  Copar Pumice must "set forth specific facts . . . from which a rational trier of fact could find for the nonmovant."  Adler v. Wal-Mart Stores, Inc., 144 F.3d at 671 (internal quotation marks omitted).  In this case, the issue is whether Copar Pumice has brought forth sufficient evidence to show that there is a genuine issue of material fact whether it is similarly situated to other entities. If there is a genuine issue whether Uhl and McElroy have treated Copar Pumice differently, the Court should let the case to proceed to trial.  If Copar Pumice has not shown that there is a genuine issue whether it is similarly situated to other entities, then Uhl and McElroy are entitled to summary judgment as a matter of law. See Jicarrilla Apache Nation v. Rio Arriba County, 440 F.3d 1202 at 1210.

The burden on Copar Pumice here is similar to the burden that the Jicarilla Apache Nation faced in Jicarilla Apache Nation v. Rio Arriba County, where the Tenth Circuit considered "whether the compared properties were similarly situated in every material respect." 440 F.3d at 1210. In Jicarilla Apache Nation v. Rio Arriba County, the Tenth Circuit noted that, "[i]f we find either a rational basis for the treatment or a material difference between the properties, then summary judgment for the Defendants on the constitutional claim was appropriate." Id. Under this standard, to overcome Uhl and McElroy's motion for summary judgment, Copar Pumice must introduce evidence that, if believed, would establish both that there was no rational reason for the Uhl and McElroy's actions and that it is similarly situated in every material respect to other entities which received different treatment from NMED; if Uhl and McElroy can show a rational reason for their actions, or if "there is *any* material difference between it and allegedly similarly situated parties that relates to a governmental interest," then the Court should enter summary judgment for Uhl and McElroy. Id. at 1213 (emphasis in original).[3]

---

[3] It is not entirely clear from the Tenth Circuit case law whether the determination that entities or people are similarly situated is a question of law or a question of fact. In other contexts, the Tenth Circuit has indicated that similarly situated status is normally a factual question, see Riggs v. AirTran Airways, Inc., 497 F.3d 1108, 1117 (10th Cir. 2008)(noting that, in employment context, whether two employees are similarly situated is normally a question of fact), so it may be that the standard is as the United States Court of Appeals for the Seventh Circuit has expressed: a question of fact, but one with an extraordinarily heavy burden, see McDonald v. Village of Winnetka, 371 F.3d 992, 1002-03 (7th Cir. 2004)(cited in Jicarilla Apache Nation v. Rio Arriba County, 440 F.3d at 1213). At a minimum, courts have to determine whether there is sufficient evidence of entities being similarly situated. Courts have "imposed exacting burdens on plaintiffs to demonstrate similarity in class-of-one cases." Jicarilla Apache Nation v. Rio Arriba County, 440 F.3d at 1213. Even if similarly situated is a question of fact rather than a question of law, Jicarilla Apache Nation v. Rio Arriba County indicates that a showing such as Copar Pumice has made in this case, where the evidence reveals a number of differences between entities, is insufficient to survive summary judgment. As the Second Circuit said in a statement that the Tenth Circuit approvingly cited in Jicarilla Apache Nation v. Rio Arriba County, a plaintiff must show that "no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy." Neilson v. D'Angelis, 409 F.3d 100, 105 (2d Cir. 2005)(emphasis added), overruled on other grounds by Appel

Mr. Manges has presented documents that he contends shows the disparate treatment of Copar Pumice compared to other similarly situated entities, including Copar Pumice facing past violations. See Response, exhibits K-L. While the structure of the fine assessment follows a set format, the materials presented do not convince the Court that this demonstrates that Copar Pumice in the present situation can be treated as 'similarly situated' to Copar Pumice during earlier assessments or to any of the other entities whose fine assessment documents are presented here.

First, most of the documents presented show the amount that was finally paid after the entities in question entered into negotiations with NMED. Mr. Manges stated at oral argument that exhibit J was the best example of a comparable fine assessment which demonstrates that Copar Pumice is being treated differently than other similarly situated entities.  The fines assessed in exhibit J do not demonstrate, however, a substantial difference in the fines assessed against Copar Pumice in the present dispute. The only exhibits that show both the initial assessment and the final settlement are exhibits K and L, which were settled for approximately sixty percent and forty percent of the initially assessed fines, respectively.  The fines in those cases were for "operating without a modified permit" (Exhibit K) and "plant relocation notice" (Exhibit L).

v. Spiridon, 531 F.3d 138 (2d Cir. 2008).

   In the absence of clear direction from the Tenth Circuit, the Court concludes that the issue is one of fact, but the plaintiff is held to a rigorous requirement, as a matter of law, of coming forward with evidence to meet both prongs of the test in Jicarrilla Apache Nation v. Rio Arriba County.  Here, there is no dispute about the underlying historical evidence.  Instead, the parties dispute whether that evidence shows that Copar Pumice is similarly situated to other entities.  As Jicarrilla Apache Nation v. Rio Arriba County indicates, a plaintiff faces a heavy burden in avoiding summary judgment on this issue.  That burden is not inconsistent, however, with the ultimate determination whether any two entities are similarly situated being a question of fact.  A plaintiff may be required to meet a heavy burden of production before a court will find a factual issue whether the entities are similarly situated and thus dismiss many cases on summary judgment, and then nonetheless submit the ultimate question to the jury in a case where the plaintiff has introduced sufficient evidence of similarity.

-24-

Neither of these violations is comparable to the violations Copar Pumice allegedly committed in the present case. Thus, the documents presented do not, without more, show disparate treatment. In attempting to draw meaningful comparisons between the fines assessed by Uhl and McElroy in this case and the record of fines assessed in the past, the Court is left comparing apples to oranges. Copar Pumice has thus not met its burden of coming forward with evidence showing that there is no material difference between it and the other entities.

Second, Copar Pumice shows evidence of fines it has previously paid for various violations of its permit conditions, arguing that the smaller totals in those cases are indicative that the fines NMED has assessed in the present instance show the "arbitrary, capricious, and malicious treatment" they are receiving at the hands of Uhl and McElroy. The fact of Copar Pumice's presently alleged violations, following previous violations by Copar Pumice as well as other entities under the same ownership, may prevent Copar Pumice, however, from being "similarly situated" to other entities in other material respects. In other words, the fact that Copar Pumice is an alleged "repeat offender" appears to the Court to be a material difference between the other entities, including Copar Pumice in the past, and Copar Pumice in the present instance. In any case, without information about the other entities' assessments, Copar Pumice has not met its burden of showing the other entities are similarly situated to Copar Pumice.

In <u>Jicarilla Apache Nation v. Rio Arriba County</u>, the tribe ran an elk hunting lodge on an extensive ranch in northern New Mexico. 440 F.3d at 1204. The County changed the property's tax classification from a favorable status, under which the land was classified as agricultural and the elk were classified as livestock, to a "miscellaneous non-residential" status; the elk lost their livestock status. <u>Id.</u> As a result, the annual property tax bill of the Jicarilla Apache Nation increased by approximately $110,000. <u>See id</u>. The Tenth Circuit recognized the possibility that

the fact of a tax assessor needing a test case to determine whether a new classification would be treated as legitimate could be a legitimate purpose -- though it would undeniably result in disparate treatment of similar entities, and would inevitably result in non-uniform treatment of uniform taxpayers. See id, at 1211 n.4.

Copar Pumice contends that it is "identically" situated to other penalized companies because they are all owned by Richard Cook; they all do business in Espanola, New Mexico; and because they all engage in similar processing activities. See Response ¶ 12 at 7. Under the standard that the Tenth Circuit articulated in Jicarilla Apache Nation v. Rio Arriba County, however, the Court must also consider other factors. For example, that Copar Pumice is owned by someone who has faced repeated other penalties suggests that Copar Pumice is not similarly situated to those other entities: Copar Pumice is the first entity owned by Richard Cook to be cited for these violations following a number of other violations. Thus, Copar Pumice has not met is burden of showing that it is similarly situated in every material respect to the other entities.

Indeed, under the Jicarilla Apache Nation v. Rio Arriba County standard, Copar Pumice may legitimately be treated differently because NMED has decided to pursue certain violations more aggressively. In Jicarilla Apache Nation v. Rio Arriba County, the county tax assessor reclassified only one property, resulting in a higher tax liability for that property.  See 440 F.3d at 1204. The assessor then offered several reasonable justifications for the reclassification  of only one property. See id. at 1211. One of these rationales involved the fact that the assessor had received a detailed letter from the Bureau of Indian Affairs ("BIA") containing information about the agricultural and non-agricultural income of the ranch, and about the recreational opportunities available to guests at the ranch. See Jicarilla Apache Nation v. Rio Arriba County, 440 F.3d 1202 at 1211. The Tenth Circuit in that case found that the information the assessor had received was a

"bird in hand" and that the fact of having that information could justify the reassessment of that property without concomitant reassessment of other properties. Id. In this case, Copar Pumice has submitted evidence of citizen complaints regarding the alleged violations of permit conditions. See Motion to Supplement, Exhibits P-Q. Without knowing whether there were similar complaints in the other situations cited, it is impossible to say that this fact alone, like the BIA letter in Jicarilla Apache Nation v. Rio Arriba County, could not justify pursuing a particular case more aggressively than another. Again, Copar Pumice has failed to meet its burden of showing that Copar Pumice is similar in every material respect to the other entities.

Finally, while the violations and permits described in the other fine assessments are similar in many ways to the present violations of which Copar Pumice is accused, none of these situations are the same. See Response, Exhibits K-L. In each of the examples that Copar Pumice has submitted, there are variations in one or more factors: the violation charged; the number of days the violation continued; the degree to which the entity cooperated, or the specific facts of the case. There are  too many factors for the Court to find that these documents are evidence of similarly situated entities facing disparate treatment under the meaning of these terms in a class-of-one equal-protection case.

It is worth examining the calculation of the penalties in some detail. Copar Pumice has submitted numerous documents showing previous notices of violation and settlement agreements reached with Copar Pumice in the past as well as similar documents from NMED actions against other entities. These documents follow the format of the NMED Air Quality Bureau Civil Penalty Policy and state the basis of authority, the permit number, the date of inspection, and violations found. This information is followed by a calculation of the fine. This fine is calculated using a matrix of various factors including "Gravity Component," "Multi-Day Component," and

"Economic Benefit."  These factors are modified by various adjustors: for example, the "Gravity Component" is calculated using a modifier for "Potential for Harm" and the "Extent of Deviation." Finally, the entire fine assessed is modified by "Adjustment Factors," which include "Effort to Comply," "Negligence/Willfulness," "History of Non-Compliance," "Financial Condition," and "Unique Adjustment."  Each of these modifiers are explained under a heading showing the "Basis" for the modifiers.  The complexity of this fine assessment structure, coupled with the great variety of violations charged in the various documents submitted, underlines the difficulty Copar Pumice faces in showing that they are similarly situated to the other entities in question.

These notices of violation presented as evidence of Copar Pumice's being similarly situated to other violators in past actions are based on the same Policy as that used to calculate the fines against Copar Pumice, and some of the violations are also the same or similar.  The Court's concern, however, is that the present dispute represents an ongoing action, whereas the examples submitted by Copar Pumice are of settlements reached or, in one case, final judgments based on an administrative hearing.  They present a snapshot of the final product of the notice of violation, fines assessed, negotiations completed, and final agreements. The fines assessed against Copar Pumice in this dispute represent a final determination, but, as Mr. Manges conceded at argument, are still subject to appeal.  See Tr. at 58:6-10.  The Court is faced, on the one hand, with a record of the final agreement reached between NMED and various entities for particular violations and on the other with a penalty assessed which has not been subject to the same process of negotiation, settlement, appeal, or adjudication as the others.  Thus, while some of the dollar amounts shown in other cases for apparently similar violations are indeed much smaller than some of the dollar amounts presently demanded from Copar Pumice by NMED, the Court does not find that the "final" fines assessed or paid in other cases are comparable to the fines assessed here, which

remain subject to appeal.  The Court finds this difference between final product and proceedings in process to be a material difference between Copar Pumice and the other allegedly similarly situated entities cited.[4]  Thus, Copar Pumice has again failed here to show that they are similarly situated to any of the other entities whose violations and fine assessments are submitted into evidence.

There is no evidence before the Court demonstrating that the amount settled upon by the parties in those other disputes is in any way reflective of the initial fine assessed. The Court does not therefore see evidence that the fines assessed in this case are reflective of the amount of a fine which may finally be settled upon by the parties in this case.[5] If this case had gone through the same settlement or administrative process as the cases cited as comparisons, it is impossible to say on the evidence before the Court that the end result would not have been more similar to the results in those other cases. Accordingly, the Court finds that Copar Pumice has failed to show that they are similarly situated to other entities that the NMED has treated differently.  Therefore, there is no genuine issue of material fact regarding this question, and the Defendants are entitled to summary judgment as a matter of law.

**IT IS ORDERED** that the Motion for Summary Judgment on Behalf of Mary Uhl and Debra McElroy on the Basis of Qualified Immunity is granted.

---

[4] This conclusion raises the question about the timing of Copar Pumice's suit. The Court is not saying Copar Pumice must settle first. The Court is saying, however, that if Copar Pumice is going to sue at this early stage, it needs to compare assessments to assessments, and not to final settlements.

[5] While Mr. Manges indicated at oral argument that settlement offers had been made, he conceded that no evidence of the offer had been presented to the Court. The Court consequently has no evidence before it to suggest that NMED has refused a settlement offer similar to one which has been accepted by other similarly situated entities. See Tr. at 32:7-14.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Joseph E. Manges,
Comeau, Malgeden, Templeman & Indall, LLP
Santa Fe, New Mexico

   *Attorneys for the Plaintiff*

Jerry A. Walz, Esq.
Walz and Associates
Cedar Crest, New Mexico

   *Attorneys for the Defendants*

-30-